No. 48,187

STATE OF KANSAS, ex rel., Nick A. Tomasic, District Attorney for the 29th Judicial District; *Appellee and Cross-Appellant*, v. SHIRLEY C. CAHILL and JOE MULICH, Board of Public Utilities of Kansas City, Kansas, *Appellants and Cross-Appellees.*

(567 P.2d 1329)

Opinion filed July 11, 1977.

*John H. Fields*, of Carson, Fields & Boal, of Kansas City, argued the cause, and was on the brief for the appellants and cross-appellees.

*Thomas L. Boeding*, assistant district attorney, argued the cause, and *Curt T. Schneider*, attorney general, and *Nick A. Tomasic*, district attorney, were with him on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

MILLER, J.: This proceeding in the nature of quo warranto was commenced by the state on relation of the district attorney of the twenty-ninth judicial district (Wyandotte County) to oust Shirley Cahill and Joe Mulich, the defendants-appellants, from their elective positions as members of the Board of Public Utilities of Kansas City, Kansas. The matter was heard by three of the senior district judges of that district, sitting *en banc*. Judgment was entered ousting the defendants from office. They appeal and the state cross-appeals. The principal issue is whether the findings of the trial court are supported by substantial competent evidence, and whether the findings support the court's conclusions of law. Other points raised will be stated as they are addressed in the opinion.

The Board of Public Utilities of Kansas City, Kansas (referred to herein as the Board or the B.P.U.) is a five-member panel which directs the operation of the publicly owned water and electric utility systems in that city. It was created in 1929 by enactments of the legislature which now appear as K.S.A. 13-1220, *et seq.* Members of the Board are elected by the city at large for four-year terms. Shirley Cahill and Joe Mulich were so elected, and took office on April 7, 1975. The Board then consisted of Paul A. Haas,

president of the board; James H. Browne; Shirley Cahill; Joe Mulich, and Al Bukaty, secretary. Mr. Bukaty resigned from the Board a few days before this proceeding was commenced, and Joe Mulich was then elected secretary.

The petition for ouster was filed on November 12, 1975. It contained nine causes of action. Two related to Mulich alone, seven concerned both defendants. All charges were denied. Trial commenced on December 1, 1975, and was concluded on December 11, 1975. The trial court filed a written memorandum on the following day. The court found willful misconduct in office on the part of both defendants as charged in the first cause of action, and it found willful misconduct on the part of Mr. Mulich with respect to the sixth cause of action. On this basis it ruled that the defendants had forfeited their office and the court ousted them from their elective positions.

The first and sixth causes of action, omitting formal allegations, read as follows:

(First cause of action.)

"That on or about May, June or July, 1975, [Shirley C. Cahill and Joe Mulich] did willfully misconduct themselves in said offices by the following actions, to-wit:

"(A) On May 9, 1975, the defendant, Shirley C. Cahill, was advanced the sum of eight hundred dollars ($800.00) by the B.P.U., upon her request, as expense money to attend an APPA conference in Boston, Massachusetts, said eight hundred dollar ($800.00) expense money being in addition to her airfare in the amount of two hundred, twelve dollars and seventy-three cents ($212.73) which was paid directly by the B.P.U. The defendant, Shirley C. Cahill traveled to and stayed in Boston, Massachusetts, for five (5) days and nights, from May 15th to May 20th, 1975, while said conference was in session. Sometime in June, July, or August, 1975, an exact date being unknown, Shirley C. Cahill did file an expense report with the B.P.U. for said APPA conference showing expenses of eight hundred, forty dollars and fifty-seven cents ($840.57). The presentation of said expense report and the acceptance of public funds as payment for her alleged expenses constitutes willful misconduct as the bill was excessive and knowingly padded.

"(B) On May 9, 1975, the defendant, Joe Mulich, was advanced one thousand, two hundred dollars ($1,200.00), upon his request, by the B.P.U., as expense money to attend an APPA conference in Boston, Massachusetts, said one thousand, two hundred dollars ($1,200.00), expense money being in addition to his airfare in the amount of two hundred twelve dollars and seventy-three cents ($212.73) which was paid directly by the B.P.U. The defendant traveled to and stayed in Boston, Massachusetts, for five (5) days and nights, from May 15th to May 20th, 1975, while said conference was in session. On July 3, 1975, the defendant, Joe Mulich, filed an expense report with the B.P.U. for said APPA conference showing expenses of one thousand, two hundred, three dollars and

twenty-two cents ($1,203.22). The presentation of said expense report and the acceptance of public funds as payment for his alleged expenses constitutes willful misconduct as the bill was excessive and knowingly padded.

(Sixth cause of action.)

"That on or about the 28th day of August, 1975, the defendant, Joe Mulich, willfully misconducted himself in said office by the following action, to-wit: On said date, Joe Mulich, along with Al Bukaty, a former board member who has since resigned, instructed the purchasing department of the B.P.U., as members of the Board, to cease purchasing hardware and related items from Tuckers Hardware and to begin buying the same hardware items from one Andy Mulich, the defendant's brother, who is the proprietor of a paint store. Said instruction to the purchasing department was carried out and the B.P.U. began purchasing hardware products from Andy Mulich.

"That the said aforementioned conduct of the said Joe Mulich, acting in his capacity as member of the Board of Public Utilities, legally constitutes willful misconduct in office."

## The memorandum decision of the district court filed December 12, 1975, reads in pertinent part as follows:

"The Court having reviewed the evidence and considered the arguments of counsel and the authorities cited, does now make the following findings and rulings:

"1. It is our opinion that members of the Board of Public Utilities who attend a convention should be allowed their actual, reasonable and necessary expenses for attending meetings, including travel, subsistence and other expenses reasonably related to the legitimate business of the Board of Public Utilities, and that they are under a duty to present reasonable evidence of such expenses. This does not include expenses that are purely personal in nature. On this basis, we find the expense accounts of the defendants, Exhibits 15 and 16, are false, excessive and knowingly padded, and were done with a wrongful motive, and constitute willful misconduct in office on the part of each of the defendants. Evidence submitted by the defendants of alleged similar conduct on the part of past Board members is not, in our opinion, a defense in this case. Members of the Board of Public Utilities are the only public officials we know of whose expense accounts are not subject to review by some authority.

"7. With respect to the sixth cause of action, we hold that Mr. Tomasic has proven his claims. It would have been entirely proper for a Board member to check into the procedure for purchasing supplies and services and to have brought it before the Board for action. But the conduct of defendant Mulich in instructing George Bartolac, Purchasing Agent, to terminate the purchase of supplies from Tucker and to buy hardware supplies from the Andy Mulich Paint Store is ruled to be willful misconduct in office.

"12. Ouster is a drastic action. It is a remedy that should be invoked only where the evidence is clear and convincing and the misdeeds flagrant. It is our judgment that the facts and the law in this case demand a ruling that these defendants have forfeited their office and should be ousted from their elective positions as members of the Board of Public Utilities.

"IT IS SO ORDERED.

"Dated at Kansas City, Kansas, this 12th day of December, 1975."

Appellants contend that the findings of the court on the first cause of action are contrary to the evidence, and that the findings do not support the court's conclusions of law. The targets of the first cause of action are claims for travel expense which were filed by the defendants and paid by the B.P.U.

Mr. Haas, Mrs. Cahill, and Mr. Mulich, as authorized representatives of the B.P.U., attended an annual conference held by the American Public Power Association in Boston, Massachusetts during May, 1975. Plane and hotel reservations were made in advance for them by B.P.U. employees, and the cost of transportation by air was paid directly to the air line by the B.P.U. Hence, air travel expense is not an issue here. Prior to leaving on the trip, Mr. Haas and Mrs. Cahill each drew an advance from the B.P.U. of eight hundred dollars, and Mr. Mulich drew twelve hundred dollars.

Mr. Haas returned one day earlier than the others, and his expenses cover a four-day period, while theirs each covers five days. Haas's total claim, including his hotel bill of $215.64, was $286. He refunded the difference between his expenses and his advance, or $514, to the B.P.U.

Mrs. Cahill's total claim was $840.57; Mr. Mulich's was $1203.22. The B.P.U. paid the difference between the advances and the claims, $40.57 to Mrs. Cahill and $3.22 to Mr. Mulich.

The single rate at the convention hotel was high—$53.91 per day, including tax. This charge was, of course, beyond the control of the delegates. Mr. Haas claimed reimbursement for the exact amount of his hotel bill; Mrs. Cahill's and Mr. Mulich's claims varied slightly but not significantly from the actual charges. The disputed areas of the Cahill and Mulich claims are amounts claimed for meals, taxi fares, and entertainment. For meals, Mulich claimed $216, Cahill, $150, and Haas, $51.84. For taxi fares, Mulich claimed $211.30, Cahill, $148, and Haas, $4.75. For entertainment, Mulich claimed $363.56, Cahill, $135.20, and Haas, nothing.

As to meals, Haas testified that he, Mrs. Cahill, and Mr. Mulich all attended at least three dinners, perhaps four, and one noon luncheon, all of which were put on by manufacturing and engineering firms. The host firm not only paid for these meals, but also picked up the cab fare when the dinner was held somewhere

other than in the convention hotel. Haas paid only for his breakfasts and noon luncheons. Mrs. Cahill remembered attending only one function—a cocktail party—which Mr. Haas attended. She contended that she purchased all of her meals. She had prepared some notes for trial, calling on her memory as she was best able; these showed daily breakfasts at $12 each, including tips; lunches from $23 to $30; and dinners from $45 to $50 for each of the first four days. Mr. Mulich recalled attending only one dinner at which Mr. Haas was present. Mulich contended that he purchased all of his meals. In short, the evidence was disputed as to whether Mrs. Cahill and Mr. Mulich paid the claimed amounts for their meals, or whether most of the expense for their meals was borne by others.

As to taxi fares, Mr. Haas testified that other than to and from the airport in Boston, cab fares were paid by the firms sponsoring the dinners, and other use of cabs was unnecessary. Mr. Mulich testified that he stored his car at the airport in Kansas City, and included that charge under the taxi fare heading; that he rented a car in Boston at a cost of some sixty-some dollars, to take a short trip to see the "Plymouth or the Mayflower or whatever" on a Sunday, and he included that car rental under taxi fares; that he considered that a trip on business of the B.P.U., since he was there; and that he did use a taxi while he was in Boston. Mrs. Cahill testified that her husband paid the cab fare for Mr. Haas from the Boston airport to the hotel, approximately twenty dollars. Neither Mrs. Cahill nor Mr. Haas gave any further explanation as to their claims for taxi fares.

As to entertainment, Mr. Mulich testified that he had a "hospitality room" in his hotel room, and that he entertained other delegates. He purchased liquor and supplies from a supermarket, and invited "whoever wanted to come by to come on up." The cost of this was $150. In addition, he contended that he spent $213.56 for "dinner—light lunch or whatever" for other delegates. Mrs. Cahill did not explain the $135 item for entertainment on her claim voucher, other than to say that the total amount of her claim was correct, and she did not give directions to list that amount for "entertainment" when her claim voucher was being prepared. Mrs. Cahill's notes, prepared for trial, showed substantial daily entries for "entertainment." These were not further explained.

Mr. Haas, president of the Board, testified in effect that he did not do any entertaining, and he did not know of any hospitality room, dinners or other entertainment provided by Mrs. Cahill or Mr. Mulich for anyone else.

This evidence presented an issue for resolution by the trier of fact: whether the defendants knowingly presented claims for reimbursement for expenses they did not incur, or which they knew to be purely personal in nature, or whether the claimed expenses were reasonable, necessary, and actually incurred. The findings of the trial court are supported by substantial competent evidence, and will not be disturbed on appeal.

K.S.A. 60-1202 provides in substance that an action in quo warranto may be brought "whenever any public officer shall have done or suffered any act which by the provisions of law shall work a forfeiture of his or her office."

K.S.A. 60-1205 sets forth the grounds for forfeiture of public office:

"Every person holding any office of trust or profit, under and by virtue of any of the laws of the state of Kansas, either state, district, county, township or city office, except those subject to removal from office only by impeachment, who shall (1) willfully misconduct himself or herself in office, (2) willfully neglect to perform any duty enjoined upon him or her by law, or (3) who shall commit any act constituting a violation of any penal statute involving moral turpitude, shall forfeit his or her office and shall be ousted from such office in the manner hereinafter provided."

The commissioner of waterworks and street lighting of Kansas City, Kansas was ousted from office by this court in 1927. *State, ex rel., v. Darnall,* 123 Kan. 643, 256 Pac. 974. One of the findings of the commissioner in that case was that Darnall filed a claim against the city for his alleged expenses in making a trip to San Francisco to attend a convention, which bill was paid in full out of city funds; and that the bill was " 'a false bill, excessive, and knowingly padded by the defendant, C. D. Darnall, and constitutes gross and willful misconduct' " on his part. This court approved the commissioner's findings, concluded that Darnall had willfully misconducted himself in office, and entered judgment of ouster. We adhere to and reaffirm the view therein expressed, that the presenting of a false and excessive claim, knowingly padded, constitutes willful misconduct in office.

We do not mean to imply that public officials may not attend banquets or luncheons scheduled as a part of a conference or

convention, and claim reimbursement for the required cost thereof; neither, as Judge Claflin expressed it during this trial, is it expected that persons attending such functions will eat at McDonald's. Likewise, minor and unintentional errors in claims of public officials for reimbursement of expenses do not indicate an intent to defraud or constitute willful misconduct in office. But intentional claims for expenses not actually incurred, and grossly excessive claims, willfully presented, fall into a separate and much more serious category.

We conclude that the trial court's findings of fact fully support its conclusions of law, and the action taken. The trial court recognized that ouster is a drastic action, and should be invoked only where the evidence is clear and convincing, and the misdeeds flagrant.

Although quo warranto was a writ of right at common law, actions in the nature of quo warranto are now generally held to invoke the discretionary powers of the trial court and thus the grant or denial of relief rests within its sound discretion. *State, ex rel., v. Lane Rural High School District,* 173 Kan. 1, 243 P.2d 232; and see 65 Am. Jur. 2d, Quo Warranto § 10, p. 236. This is proper and just, since minor infractions should not make such drastic relief mandatory.

Here, the trial court has exercised its discretion by decreeing ouster. It had the advantage of hearing all of the evidence directly from the witnesses and was able to observe the giving of the testimony. We cannot say that the trial court abused its discretion, and we find no error here.

Defendants (or more properly Mr. Mulich, to whom the sixth cause of action applies) contend that the findings of the trial court on the sixth cause of action are contrary to the evidence, and likewise do not support the trial court's conclusion of law. The evidence favorable to the plaintiff, and thus with which we are here concerned since we cannot weigh the evidence and make findings of fact, is as follows: The B.P.U. had been purchasing industrial hardware supplies from Tucker Hardware, the only wholesale hardware firm in Kansas City, Kansas, for about fifty years. Tucker issues a catalog, listing and pricing its merchandise, and thus its merchandise descriptions and prices were known to purchasing agents of the B.P.U., as well as to other hardware merchants in the area. The Board also made smaller

purchases each year from the Stowe, Miller and Strasser Hardware Stores.

George Bartolac, purchasing agent for the B.P.U., testified that board members Joe Mulich and Al Bukaty came to his office and closed the door about 1:15 o'clock p.m. on August 28, 1975. They told him that he was to do no more business with Tucker Hardware, and to tell his associates and the employees in his department that this was a directive of the Board. Mr. Mulich directed Bartolac to buy hardware thereafter from the Andy Mulich Paint Store. (Andy Mulich is a brother of appellant Joe Mulich.) Before they left, Bukaty said, "If anyone finds out that we were in here and tells this, we will know where it came from."

Bartolac immediately stopped buying from Tucker, and purchased his hardware supplies from Andy Mulich, though the prices were generally much higher. Later, when items supplied by the Andy Mulich Paint Store were not correct, Joe Mulich came to Bartolac and told him that he would get it straightened out. Also, when Bartolac found that he could not get some required items anywhere except from Tucker, he discussed this problem with Al Bukaty. Bukaty then authorized the purchase of those items from Tucker, and Bukaty called Joe Mulich from Bartolac's office and told Mulich that he had authorized Bartolac to buy certain hard-to-get items from Tucker.

This testimony was disputed, and contrary evidence was received. But the evidence favorable to the state was substantial and competent, and entirely adequate to support the trial court's implicit findings that Mulich gave a direct order to Bartolac to spend public funds in purchasing hardware from his brother, regardless of price or any other factor. The evidence further indicates that after the August 28 conversation, Mulich was monitoring purchases made by the purchasing department, in order to insure that his directive was being followed.

We have held that it is willful misconduct in office for a public officer to cause a public agency to pay excessive prices for items it purchases. *State, ex rel., v. Howard,* 123 Kan. 432, 256 Pac. 172.

We conclude that the evidence as to cause of action No. 6 was substantial and competent to support the trial court's findings, and its findings support its conclusions of law and the action taken. What has been said above relating to the trial court's action on the first cause of action need not be repeated here.

Next, appellants contend that the trial court erred in refusing to continue the trial of the cause or dismiss the case or impose other sanctions as provided by K.S.A. 60-237, because of the failure of the plaintiff to produce copies of statements taken before trial. The record indicates that a few days before trial, both parties requested copies of statements taken by the other, and the trial court ordered a simultaneous exchange. This had not been accomplished by the first day of trial. At that time the trial court directed the parties to exchange tapes or transcripts or whatever was available pertaining to each witness by noon of that day. Presumably this was done, and there is no further mention of any difficulty in this regard in the record before us. We have often held that the granting of a continuance rests within the sound discretion of the trial court, and its judgment will not be overturned absent an abuse of discretion. Likewise, the imposition of sanctions under the discovery rules is a matter vested in the sound discretion of the trial court. No prejudice is shown in the record before us, and we find no abuse of discretion, and no error.

Appellants next contend that the trial court erred to the prejudice of the appellants, by permitting plaintiff to introduce evidence on the fifth, seventh and eighth causes of action, when those causes of action did not state grounds upon which relief could be granted as a matter of law.

The trial court heard evidence as to all charges; it then resolved all of the issues in one memorandum, by which it absolved the defendants of any wrongdoing on the charges contained in the fifth, seventh and eighth causes of action. We note that each of those causes of action stated grounds which, if established, would entitle the plaintiff to the relief sought, or at least would constitute grounds for ouster in the discretion of the trial court. Defendants demonstrate no prejudice, and we find none in the handling of the trial in this regard.

Defendants next claim that the trial court erred as a matter of law in denying defendants' application for an order directing the news media, during the pendency of the trial, not to publish newspaper accounts containing a synopsis of or excerpts from or any narrative form of the testimony of witnesses. The trial court placed the witnesses "under the rule" during the trial of this action; defendants contend that this action was nullified by the court's failure to prohibit the news media from reporting the

evidence received in open court. Again, defendants claim prejudice but they do not demonstrate it in the record before us. None of the cases cited are civil in nature, and none of them deal with the reporting of proceedings in open court. In a recent case involving a partial gag order issued prior to trial by a Nebraska court, the United States Supreme Court in *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 49 L.Ed.2d 683, 96 S.Ct. 2791 (1976) struck down the gag order, saying:

"To the extent that this order prohibited the reporting of evidence adduced at the open preliminary hearing, it plainly violated settled principles; 'there is nothing that proscribes the press from reporting events that transpire in the courtroom.' . . ." (p. 568.)

And see *Oklahoma Publishing Co. v. District Court,* 430 U.S. 308, 51 L.Ed.2d 355, 97 S.Ct. ____ (1977).

Clearly, the trial court did not err in refusing appellants' motion; the news media was quite properly permitted to report proceedings which took place in open court. The need for the public to know what is going on in an ouster proceeding is substantial, and certainly outweighs the remote possibility of prejudice to parties in this civil proceeding.

We have carefully examined each of the remaining points raised by the appellants. Eight of these deal with rulings of the trial court on evidence, and we have in each instance reviewed the record and the ruling of which complaint is made, and we find no error. Discussion of the remaining point would unduly prolong our opinion and add nothing of value to it; we have ruled on each of these points before.

This is a fact case. From the voluminous record it is apparent that the trial court carefully considered the testimony of the more than fifty witnesses who testified in this case, and that its judgment is amply supported by the record and should be affirmed. We conclude that the court committed no prejudicial error.

The issues raised on the cross-appeal need not be decided, for those issues become moot upon the affirmance of the judgment below.

Before leaving this case, however, we commend the trial judges in the expeditious handling of this matter. It is in the public interest that such cases be tried and determined with dispatch. The hearing of such matters by three judges sitting *en banc,* as was done here, is appropriate where it appears that the evidence

will be sharply conflicting, the law difficult, and the public interest keen.

*The judgment of the trial court, ousting Shirley Cahill and Joe Mulich from their elective positions as members of the Board of Public Utilities of Kansas City, Kansas, is affirmed. The cross-appeal is dismissed as moot.*