No. 70,390

STATE OF KANSAS v. JOHN ALSTON, *Appellee.*

THE ATCHISON GLOBE AND GARY DICKSON, *Respondents in Contempt Proceedings/Appellants.*
(887 P.2d 681)

572

Opinion filed December 16, 1994.

*Daniel S. Garrity*, of Garrity, Kuckelman & Kurth, of Atchison, argued the cause and was on the brief for appellants.

*Gunnar A. Sundby*, of J. David Farris Law Offices, of Atchison, argued the cause and was on the brief for appellee.

*Melanie S. Morgan*, of the Law Office of Joseph D. Johnson, Chartered, of Topeka, was on the brief for *amicus curiae* the Kansas Association of Criminal Defense Lawyers.

*William G. Howard*, of Lathrop & Norquist, L.C., of Overland Park, was on the brief for *amicus curiae* the Kansas City Star Company.

The opinion of the court was delivered by

LOCKETT, J.: A newspaper and its publisher appeal their convictions of indirect contempt of court for violating the district court's order not to publish information contained in the court record and discussed in open court concerning the criminal background of the accused awaiting trial and the fact of the court's order.

On April 30, 1993, John Alston was charged with two felonies and five misdemeanors resulting from the stop and search of his vehicle by a Kansas Highway Patrol Trooper. Later that day, an Atchison district court services officer filed a "Bond Screen Report" on Alston. That report, filed with the clerk of the district court, initialed by Judge Maurice O'Keefe, and part of the public

court file, listed Alston's aliases and his prior record of multiple charges and convictions. Shortly after Alston's arrest, the Atchison Daily Globe (Globe) published an article stating Alston had been denied bail on the basis of his previous conviction of felony theft. Apparently, a Globe reporter acquired information for the article from the county attorney.

Prior to trial, Alston's defense counsel filed a motion to suppress certain evidence gathered from Alston's vehicle and a motion in limine to prevent the State from discussing or introducing evidence of Alston's prior record or outstanding warrants for his arrest. On June 25, 1993, the district judge heard the motions. There had been no request by either party to close the proceeding to the public. A Globe reporter was in the courtroom. The district judge granted defense counsel's motion in limine. When the judge asked counsel whether there was "[a]nything else along that line," defense counsel noted the presence of the Globe reporter in the courtroom and expressed concern that publishing Alston's prior criminal history in the newspaper would bias the jury venire and force the defense to request a change of venue. In response to defense counsel's concerns, the district judge ordered the reporter not to report Alston's criminal history or the fact that the court prohibited publication. The judge stated that because the trial would be held in a small town, he wanted the State and the defendant "to start out on the same basis at the time of trial." The court's order was issued at approximately 10 a.m. The publication deadline for the Globe's Friday evening edition was 12 noon. The Globe does not publish a Saturday newspaper.

The reporter informed her superiors of the court's order. The Globe was unable to contact its counsel or the counsel for the Kansas Press Association. The Globe's managing editor phoned and talked to the judge. The publisher of the Globe, Gary Dickson, concluded that the judge would not rescind the order after a discussion with the managing editor. Because Dickson believed the court's gag order was constitutionally invalid and would unacceptably delay publication of the news, he decided to publish the story.

The evening edition of the Globe carried a front page story with the headline: "O'Keefe imposes gag order on Globe; Tells

newspaper not to report order because it might prejudice Alston jurors." The article begins:

"District Court Judge Maurice P. O'Keefe imposed a gag order on the Globe this morning restricting any reports about drug defendant John Alston's background.
"He also told the Globe not to report the gag order because that would create suspicion to possible jurors."

The article went on to report that Alston had a criminal background that had been the subject of defense counsel's motion in limine and had used a number of false names to avoid arrest, and it quoted statements by the court and counsel about whether Alston's prior convictions should be introduced as evidence. The Globe also sent a copy of its article to the Associated Press.

On Sunday, June 27, the Globe published a second front-page article with the headline: "Globe publisher says public has right to know about case; Judge's gag order called unwarranted." That article begins: "The Atchison Daily Globe defied a gag order placed on the newspaper by District Court Judge Maurice P. O'Keefe because the newspaper felt public interest outweighed the reasons for the order, the publisher [Dickson] said." In that article, Dickson was quoted concerning the basis of his decision to defy the court's gag order:

"We respect the judicial system and Judge O'Keefe and the right for everyone to have a fair trial, but we also believe, based on the First Amendment, we have a right to report the news. In this particular place, a gag order on the Globe is not a necessary thing."

Without going into specifics, the June 27 article repeatedly made reference to the fact that Alston did have a criminal record.

On June 28, Alston's counsel filed a motion to dismiss the defendant from further prosecution, claiming because of the Globe articles the defendant would be required to file a motion for a change of venue. The defendant asserted that because he was required to seek a change of venue, he had lost his right to a fair and speedy trial. That same day Judge O'Keefe denied Alston's motion to dismiss. Without a request by the defense to change venue, and without evidence, the judge found that Alston could not obtain a fair trial because of the publicity and *sua sponte*

ordered the venue changed. Alston's criminal trial was transferred to Leavenworth district court.

On June 29, Alston filed a motion in the criminal action requesting the court to issue a citation in contempt against Dickson and the Globe for violating the court's order not to publish certain information. That same day, Judge O'Keefe issued an order for hearing on the motion for citation in contempt for violation of the court's gag order. Notice of the order was personally served on Dickson. It ordered Dickson to appear and respond to the motion.

The Globe entered a special appearance and filed a motion for recusal of Judge O'Keefe. It also requested a continuance of the hearing on the contempt citation. Judge O'Keefe granted a continuance but refused to recuse himself. Dickson and the Globe, who were now represented by the same attorney, filed an affidavit pursuant to K.S.A. 20-311d to disqualify Judge O'Keefe from presiding over the contempt proceedings. Based on the affidavit, the matter was assigned to another judge, Judge Lacey.

On August 2, Dickson and the Globe filed a motion to dismiss Alston's motion for contempt based on three grounds: (1) The court lacked jurisdiction over Dickson and the newspaper when it entered its order on June 25, 1993; (2) indirect contempt was not a remedy available to a defendant in a criminal action; and (3) the order violated the contemnors' constitutional rights to due process by denying them an opportunity to be heard.

On August 23, 1993, the court heard the matter. Alston did not present evidence, but instead relied upon the verified motion and attached newspaper articles and requested the court to take judicial notice of the prior proceedings in the criminal case. The Globe and Dickson moved for dismissal, arguing that contempt was civil in nature, the procedure required by law had not been followed, and there was not sufficient evidence to show the accused were guilty of indirect contempt. Judge Lacey ruled that indirect contempt was the correct procedure and took the remaining issues under advisement.

On August 30, 1993, the judge found the court had jurisdiction over the contemnors because Jane Thomas, the Globe reporter

who was in the courtroom on June 25, was an agent of Dickson and the Globe. The court found that even if it had originally lacked jurisdiction, that lack of jurisdiction was cured by Dickson's decision to accept personal responsibility for publishing the information by testifying at the hearing. The judge concluded that lack of due process was not an issue because the Globe and Dickson published the article without first seeking relief from the court's order. The judge found the Globe and Dickson guilty of indirect contempt for reporting the gag order and Alston's previous criminal history.

The judge fined the Globe 10 times the cost resulting from the change of venue, not to exceed $2,500. Because 10 times the expenses resulting from the change of venue exceeded the $2,500 cap, the judge set the fine at $2,500. The judge sentenced Dickson to serve seven days in the county jail, five of which would be suspended after Dickson had served 48 hours. Payment of the fine and serving the sentence were stayed by the judge pending the appeal. Dickson and the Globe timely filed a notice of appeal. The case was transferred to this court pursuant to K.S.A. 20-3018(c). In our analysis we will refer to the Globe and Dickson as "the newspaper."

The term "gag order" as used herein refers to orders of the court directed to reporters to not report court proceedings, or certain aspects thereof. Black's Law Dictionary 678 (6th ed. 1990). We are to determine if the trial court erred in finding a newspaper guilty of indirect contempt for violation of the court's *sua sponte* gag order prohibiting the publication of information obtained from the court's record and in open court. Although the parties raise specific issues, the analysis is divided into two areas: the validity of the gag order, and if the order is invalid whether the newspaper is guilty of indirect contempt.

Alston claims that an appellate court cannot go beyond the contempt citation when reviewing the validity of the trial court's order of June 25. Alston asserts that because the newspaper did not file a separate action to set aside the gag order, the appeal is an improper, multiple-pronged, collateral attack of the indirect contempt citation. Alston notes that one of the possible actions avail-

able to the newspaper to attack the court's order restraining publication of the information was mandamus, K.S.A. 60-801 *et seq.* See *Kansas City Star Co. v. Fossey,* 230 Kan. 240, 630 P.2d 1176 (1981).

## Prior Restraint

The newspaper asserts that its First Amendment rights cannot be impaired by an ex parte order issued by a judge without a showing that an emergency or extreme circumstances exist. It argues that injunctive relief can be granted only after a hearing or a showing of irreparable injury by the person requesting the relief. The newspaper emphasizes that Alston did not request a gag order and that his counsel was surprised when Judge O'Keefe issued the gag order. It contends that more than vague references by an accused in a criminal case that the press would act irresponsibly is required before a trial judge has authority to *sua sponte* issue an order affecting the right to report the proceeding by the newspaper. The newspaper contends that an absolute prohibition exists against the prior restraint of publication by a newspaper of court records available to the public and events occurring in open court. It argues that any prior restraint upon such activity is an unconstitutional exercise of power by the court and void; therefore, the collateral bar rule cannot apply.

The newspaper first discusses the prohibition against prior restraint of the news media and refers this court to the case of *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976). In *Nebraska Press,* the United States Supreme Court held unconstitutional an order prohibiting the press from publishing certain information tending to show the guilt of a defendant in an impending criminal trial. In Part VI-D of its opinion, the Court focused on the information covered by the order that had been adduced as evidence in a preliminary hearing open to the public and the press. The Court concluded that to the extent the order prohibited the reporting of such evidence, "it plainly violated settled principles." 427 U.S. at 568 (citing *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029 [1975] [the press may not be prohibited from truth-

fully publishing information released to the public in official court records]; *Sheppard v. Maxwell*, 384 U.S. 333, 362-63, 16 L. Ed. 2d 600, 86 S. Ct. 1507 [1966] ["(T)here is nothing that proscribes the press from reporting events that transpire in the courtroom"]; and *Craig v. Harney*, 331 U.S. 367, 374, 91 L. Ed. 1546, 67 S. Ct. 1249 [1947] ["Those who see and hear what transpired (in the courtroom) can report it with impunity."]). The Court noted that under state law the trial court was permitted in certain circumstances to close pretrial proceedings to the public, but indicated that such an option did not allow the trial judge to suppress publication of information from the hearing if the public was allowed to attend. "[O]nce a public hearing had been held, what transpired there could not be subject to prior restraint." 427 U.S. at 568.

*Nebraska Press* does not place an absolute ban on prior restraints, even of material obtained in open court. Nevertheless, *Nebraska Press* does place a constitutional ban on such orders unless proper inquiry and findings are made by the trial judge in advance of entering the order. In determining whether a judicial order of prior restraint is permissible, a judge must examine the evidence and determine: (1) the nature and extent of the pretrial news coverage; (2) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (3) how effectively a restraining order would operate to prevent the threatened danger. 427 U.S. at 562.

Subsequent to the *Nebraska Press* decision, this court addressed ex parte restraining orders in conjunction with the First Amendment in *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 689 P.2d 860 (1984). In that case, the Board of Education (Board) obtained an ex parte order to prohibit a teacher and her husband from holding a press conference prior to the regular meeting of the Board. The district court later issued a temporary injunction and subsequently an injunction which enjoined the defendants from holding press conferences or public meetings on any of the Board's property and disrupting or interfering with any of the Board's meetings, activities, or work assignments. The defendants appealed to this court, seeking to have the restraining order, the

temporary injunction, and the resulting injunction declared unconstitutional.

The *McKinney* court noted that K.S.A. 1993 Supp. 60-903 provides for the issuance of a restraining order as a provisional remedy to a party entitled to relief, restraining the commission or continuance of some act. An application for a restraining order is also considered the application for a temporary injunction. A restraining order remains in force until the hearing for the temporary injunction. It observed that the purpose of such order is to restrain a defendant for a very brief period, pending a hearing on the application for a temporary injunction. The restraining order can go no further than to preserve the status quo until the hearing is held for the temporary injunction, the status quo being the last actual, peaceable, noncontested position of the parties which preceded the pending controversy. 236 Kan. at 227.

The *McKinney* court pointed out that the issuance of a restraining order is a matter for the sound discretion of the court. It is ordinarily done ex parte, without notice to the party affected, and for this reason should be reluctantly issued. The court observed that in view of the drastic consequences of a restraining order, the party to be restrained should be heard, when feasible, before the order is granted. It noted that despite the general undesirability of ex parte restraining orders, they are not invariably barred by the First Amendment. The *McKinney* court stated that unless there is a clear showing that it is impossible to serve or to notify the opposing party, no order restraining the basic freedoms guaranteed by the First Amendment should issue. Restrictions on free speech are valid only where necessary to protect compelling public interests and where no less restrictive alternatives are available. 236 Kan. at 227-28.

The *McKinney* court concluded that a temporary injunction cannot be granted until after reasonable notice and an opportunity to be heard are provided to the party to be enjoined. The purpose of the temporary injunction is to preserve the status quo until the court finally determines whether the request for the injunction should be granted. The temporary injunction operates as a binding restraint upon the party until rescinded by further action

of the court. 236 Kan. at 228. The rationale of *McKinney* suggests, absent unusual circumstances, that a hearing is required before orders may issue to restrain First Amendment rights.

As a part of its discussion, the newspaper cites *Carroll v. Princess Anne*, 393 U.S. 175, 21 L. Ed. 2d 325, 89 S. Ct. 347 (1968). The *Carroll* court noted that the Supreme Court has required that notice be given to affected persons before a court may enter an order denying such persons their First Amendment rights. It observed that only in extreme circumstances or in an emergency can such orders be entered ex parte. The *Carroll* court found that there was no evidence of an emergency or extreme circumstances to show that the plaintiff was prevented from notifying defendants that the plaintiff was seeking a restraining order. It ultimately reversed the Maryland Court of Appeals' upholding of the temporary restraining order as an improper prior restraint on the defendants' constitutional right to freedom of speech. 393 U.S. at 181-85.

We have noted that adverse pretrial publicity may endanger the ability of a defendant to receive a fair trial in situations where prospective jurors read or hear the adverse publicity and are affected in their judgment should they later sit as jurors. *State v. McNaught*, 238 Kan. 567, 575, 713 P.2d 457 (1986). In *State v. Ruebke*, 240 Kan. 493, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987), we discussed pretrial publicity as it affected venue and observed that in certain criminal cases there is an enormous amount of publicity concerning the crime. The *Ruebke* court noted modern communication and network methods for distribution of news allow the new media to distribute information by newspaper, radio, and television to the public statewide. Indicative of whether the atmosphere is such that a defendant's right to a fair and impartial trial would be jeopardized are such factors as the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated in other areas to which venue could be changed; the length of time which elapsed from the dissemination of the publicity to the date of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with

the publicity complained of and its resultant effect, if any, upon the prospective jurors or the trial jurors; the challenges exercised by the defendant in the selection of a jury, both those peremptory and those for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn. The *Ruebke* court concluded it was up to the defendant to show that such prejudice exists in the community that it was reasonably certain that the defendant could not obtain a fair trial. There must be more than speculation that the defendant would not receive a fair trial. 240 Kan. at 499-500.

Other than Judge O'Keefe's speculation, there is no indication that pretrial publicity would have precluded Alston from obtaining a fair trial. The judge did not consider alternatives such as changing trial venue, postponing the trial, searching voir dire, using emphatic and clear instructions, etc., as proposed in *Nebraska Press* and *Sheppard*. Neither did the district judge address how effectively a restraining order would operate to prevent the threatened danger. The record shows that prior to the judge's gag order, the Globe had run at least one article about the defendant and the fact that his Bond Screening Report in the public file listed 19 prior offenses. These facts cast doubt on the efficacy of the subsequent gag order. The district judge in this case did not make the requisite findings under *Nebraska Press* to issue a valid order.

## Public Information

The newspaper argues that even if the gag order had been properly issued, it cannot be restrained from publishing information that it obtained from public records or in open court. To support this claim, it refers to *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 51 L. Ed. 2d 355, 97 S. Ct. 1045 (1977). In that case, the Court addressed a pretrial order enjoining members of the news media from publishing, broadcasting, or disseminating, in any manner, the name or picture of an 11-year-old boy in connection with a pending juvenile proceeding. A reporter obtained the name during a hearing open to the public. The picture of the boy was taken in the courthouse hall as he

left the hearing. The United States Supreme Court noted that whether or not the trial judge expressly made such an order, members of the press were in fact present at the hearing with the full knowledge of the presiding judge, the prosecutor, and the defense counsel. No objection was made to the presence of the press in the courtroom or to the photographing of the juvenile as he left the courthouse. There was no evidence that petitioner acquired the information unlawfully or even without the State's implicit approval. The name and picture of the juvenile were " 'publicly revealed in connection with the prosecution of the crime,' " 430 U.S. at 311, much as the name of the rape victim in *Cox Broadcasting* was placed in the public domain. Under these circumstances, the district court's order abridged the freedom of the press in violation of the First and Fourteenth Amendments. 430 U.S. at 311-12.

The Court in *Oklahoma Publishing* stated that the press may not be prohibited from truthfully publishing information released to the public in official court records. It also stated those who see and hear what transpired in an open courtroom can report it with impunity. It concluded that once a public hearing has been held, what transpired there could not be subject to prior restraint. 430 U.S. at 311.

The newspaper asserts that Kansas recognized and endorsed the rule against the prior restraint of information obtained in open court in *Kansas City Star Co. v. Fossey*, 230 Kan. 240; *State v. Stauffer Communications, Inc.*, 225 Kan. 540, 592 P.2d 891 (1979); and *State ex rel. v. Cahill*, 222 Kan. 570, 567 P.2d 1329 (1977). In *Stauffer*, warrants were issued for the arrest of two individuals. A reporter for a newspaper became aware of the issuance of the warrants and the names of the individuals sought by the sheriff. The county attorney requested that the reporter refrain from giving out this information. When the reporter stated she already had the names, she was advised that K.S.A. 1993 Supp. 21-3827 prohibits publication of the names until the warrants were executed. The reporter verified the editor of the paper of the information and was told by the editor to make sure her information was accurate. The reporter obtained the names of

the two individuals for whom the warrants were issued from the office of the clerk of the district court. The names were published in the newspaper prior to the arrest of the individuals named in the warrants. The newspaper was convicted of two counts of violating 21-3827. 225 Kan. at 541-42.

The *Stauffer* court observed that the First Amendment to the United States Constitution and § 11 of the Bill of Rights of the Kansas Constitution forbid the imposition of criminal sanctions for truthful reporting of facts gleaned from public records. By placing information in the official public records, the State has thereby released the information to the public and has placed it in the public domain. It noted that, as a general rule, it may be said that if the State wants to keep the press from publishing information related to its governmental functions then it must do so by protecting the confidentiality of the information. The State is free to do so absent some limiting statute. Neither the First Amendment nor Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control. 225 Kan. at 545 (following *Houchins v. KQED, Inc.*, 438 U.S. 1, 14, 57 L. Ed. 2d 553, 98 S. Ct. 2588 [1978]). The *Stauffer* court concluded that the criminal sanctions provided in 21-3827 may not be imposed against persons, including the news media, for publishing truthful information properly obtained from public records. 225 Kan. at 548.

In *Fossey*, 230 Kan. 240, the trial judge closed the trial to hear a motion to suppress. The newspaper filed a request for mandamus in this court to allow it access to the criminal proceedings. The *Fossey* court first determined that mandamus may properly be used to expedite the official business of state officials in the discharge of their duties, where the issues are of significant statewide concern or recurring and ongoing nature, and the essential purpose of the proceeding is to obtain an expeditious, authoritative interpretation of the law. 230 Kan. at 244. It then concluded a trial court may close a preliminary examination, bail hearing, or any other pretrial hearing, including a hearing on a motion to suppress, and may seal the record only if (1) the dissemination of information from the pretrial proceeding and its record would

create a clear and present danger to the fairness of the trial, and (2) the prejudicial effect of such information on trial fairness cannot be avoided by any reasonable alternative means. 230 Kan. 240, Syl. ¶ 2.

The Kansas courts have not placed an absolute ban on prior restraint. In *State ex rel. v. Cahill,* 222 Kan. 570, a proceeding in the nature of a quo warranto, a portion of that appeal involved the trial court's refusal to prohibit the press from publishing information obtained in open court. Citing *Nebraska Press* and *Oklahoma Publishing,* this court held that the press was properly permitted to report what took place in open court. 222 Kan. at 579. Although each of these cases supports a prohibition on prior restraints, none of them establishes an absolute rule against prior restraints.

The Globe's arguments that it could not be restrained from publishing the story are supported by the clear language prohibiting prior restraints on information obtained in open court stated in *Nebraska Press* and *Oklahoma Publishing.* Regardless of whether we choose to adopt an absolute rule against prior restraints, the facts of this case do not require us to do so because the Globe reporter had gleaned the information for the June 25 story in open court, and the information the judge sought to prohibit had already been a part of public records for nearly two months. See *Cox Broadcasting,* 420 U.S. 469.

Kansas case law sets strict guidelines for closure of pretrial proceedings to the press and public. See *Kansas City Star Co. v. Fossey,* 230 Kan. 240, 630 P.2d 1176 (1981). Had defense counsel desired to pursue closure, the guidelines set out in that case should have been followed. Nevertheless, this case is not about closure of a hearing. No one attempted to close the hearing. The court's gag order was issued at the conclusion of an open hearing without the finding required in *Nebraska Press* and was unconstitutional.

### Collateral Bar Rule

The last issue is whether the order underlying the sanction of contempt is subject to the exceptions to the collateral bar rule.

*Amicus curiae* the Kansas Association of Criminal Defense Lawyers (KACDL) states the issue as "[w]hether the invalidity of the underlying gag order justifies violation of said order and necessitates a reversal of the finding of contempt." The KACDL thus starts with the premise that the gag order is constitutionally invalid and then looks at whether enforcement of the judicial order is appropriate through criminal contempt regardless of the underlying order's invalidity. Both parties also address the issue.

The collateral bar rule permits enforcement of a judicial order through criminal contempt even though the underlying order is later shown to be unconstitutional. *United States v. Mine Workers,* 330 U.S. 258, 294, 91 L. Ed. 884, 67 S. Ct. 677 (1947); *Howat v. Kansas,* 258 U.S. 181, 66 L. Ed. 550, 42 S. Ct. 277 (1922). KACDL argues that the case of *Walker v. City of Birmingham,* 388 U.S. 307, 18 L. Ed. 2d 1210, 87 S. Ct. 1824 (1967), provides an excellent example of the application of the rule. In *Walker,* a group of activists, including Dr. Martin Luther King, Jr., sought to march through Birmingham on Good Friday to decry racial discrimination. City officials sought and obtained an injunction prohibiting the march. The court's order was basically a restatement of a city ordinance. The activists, believing the order to be unconstitutional, ignored the order. They were found to be in criminal contempt of court. Although the ordinance was later struck down as a violation of the First Amendment, the criminal contempt was affirmed. The Supreme Court stated: "[I]n the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion." 388 U.S. at 320-21.

The KACDL argues that because the principles of efficient and orderly administration of justice behind the collateral bar rule are deeply rooted in American jurisprudence, only a few limited exceptions to the rule have been permitted. The KACDL notes that while neither Kansas nor the Tenth Circuit have addressed the issue, other circuits have carved out a limited number of exceptions: (1) orders resting on a defective jurisdictional base, citing *In re Establishment Inspection of Hern Iron Works,* 881 F.2d 722

(9th Cir. 1989); (2) orders that are transparently invalid, citing *Matter of Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986), *modified on rehearing* 820 F.2d 1354 (1st Cir.), *cert. granted* 484 U.S. 814 (1987), *cert. dismissed* 485 U.S. 693, 99 L. Ed. 2d 785, 108 S. Ct. 1502 (1988); (3) orders deemed invalid and when no adequate and effective remedies exist for orderly review, citing *Maness v. Meyers*, 419 U.S. 449, 460, 42 L. Ed. 2d 574, 95 S. Ct. 584 (1975) (remedies for judicial error may be cumbersome, but the injury flowing from an error generally is not irreparable, and orderly processes are imperative to the operation of the adversary system of justice); and *In re Novak*, 932 F.2d 1397 (11th Cir. 1991), and (4) when the order requires irretrievable surrender of constitutional guarantees, citing *Maness v. Meyers*, 419 U.S. 449, and *In re Novak*, 932 F.2d 1397.

The newspaper argues that *Matter of Providence Journal Co.*, 820 F.2d 1342 (1986), *modified on rehearing* 820 F.2d 1354 (1987), permits collateral attack of an unconstitutional prior restraint in a subsequent contempt proceeding. Because Judge Lacey merely considered whether the order was void on its face without considering the underlying constitutionality of the order, the newspaper argues the trial court abused its discretion. The newspaper asserts that Kansas has long held that unconstitutional orders are void. See *State v. Rucas*, 12 Kan. App. 2d 68, 734 P.2d 673 (1987) (reversing contempt citation on ground that the underlying order was unconstitutional and hence void).

In *Providence Journal*, the court issued a temporary restraining order preventing the publication of information allegedly taken in violation of several federal laws as well as the Fourth Amendment to the United Stated Constitution. The press violated the order by publishing an article containing the restrained information, and the Journal was subsequently found in criminal contempt of court. 820 F.2d at 1344-45. Using the *Nebraska Press* three-prong analysis, the court concluded that none of the requisite considerations were met. Neither the federal laws which allegedly were violated nor the Fourth Amendment privacy interest justified the restraint. The First Circuit invoked the "transparently invalid" exception to the collateral bar doctrine, found

the restraint unconstitutional, and vacated the order of criminal contempt.

The court in *Providence Journal* differentiated between arguably proper orders and transparently void orders. The court stated:

"Although an exception to the collateral bar rule is appropriate for transparently void orders, it is inappropriate for arguably proper orders. This distinction is necessary both to protect the authority of the courts when they address close questions and to create a strong incentive for parties to follow the orderly process of law. No such protection or incentive is needed when the order is transparently invalid because in that instance the court is acting so far in excess of its authority that it has no right to expect compliance and no interest is protected by requiring compliance.

"The line between a transparently invalid order and one that is merely invalid is, of course, not always distinct. As a general rule, if the court reviewing the order finds the order to have had any pretence to validity at the time it was issued, the reviewing court should enforce the collateral bar rule. Such a heavy presumption in favor of validity is necessary to protect the rightful power of the courts. Nonetheless, there are instances where an order will be so patently unconstitutional that it will be excepted from the collateral bar rule. . . .

". . . When, as here, the prior restraint impinges upon the right of the press to communicate news and involves expression in the form of pure speech—speech not connected with any conduct—the presumption of unconstitutionality is virtually insurmountable." 820 F.2d at 1347-48.

In this case, the June 25 order was transparently unconstitutional. The trial court failed to make the requisite *Nebraska Press* findings. The relevant information had been obtained from the court's records and in open court prior to the gag order. The order was issued without a full and fair hearing with all the attendant procedural protection. Like the order in *Providence Journal*, the newspaper is correct in arguing that the gag order of June 25 fits within the transparently invalid exception.

The KACDL argues that this exception is inappropriate because the decision to publish was made despite the fact that another judge was available and that emergency measures of an action in mandamus were viable alternatives. See *Fossey*, 230 Kan. 240 (mandamus used to obtain expeditious, authoritative interpretation of the law). We agree that *Providence Journal* requires that the newspaper, even when it believes that it is subject to an

unconstitutional order of prior restraint, make a good faith effort to seek emergency relief from the appellate courts. Only where timely access to an appellate court is not available can the newspaper publish and then challenge the constitutionality of the order in contempt proceedings. 820 F.2d at 1355. The case specifically notes that a newspaper seeking to challenge an order it deems transparently unconstitutional must concern itself with establishing a record of its good faith effort. 820 F.2d at 1355.

The question here is whether the newspaper was acting in good faith when it defied the court's gag order. In the course of two hours, the Globe received notice of the order, contacted the judge, and attempted to contact its attorney and the attorney for the Kansas Press Association before deciding to defy the gag order because "public interest outweighed the reasons for the order." Alternative relief was available, but not in time to meet the 12 noon deadline.

Here there is no clear showing that it was impossible to serve or notify the parties to be restrained. The judge failed to make the specific findings necessary for an ex parte order of prior restraint. The judge imposed criminal sanctions for truthful reporting of facts gleaned from the public record and what had occurred in open court. Under these facts and circumstances, the newspaper's attempts fit within the good faith required in *Providence Journal*.

The district court's finding that the Globe and Dickson were in indirect contempt of court is reversed, and the sentences imposed are vacated.