No. 80,265

STATE OF KANSAS, *Appellee,* v. RAH-MAAN SALEEM, *Appellant.*

(977 P.2d 921)

Opinion filed April 16, 1999.

*Janine Cox*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*James A. Brown*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Rah-Maan Saleem appeals his conviction of premeditated first-degree murder, K.S.A. 21-3401, an off-grid person felony, in the shooting death of Richard Todd Schmidt.

Our jurisdiction is under K.S.A. 22-3601(b)(1), for a sentence of life imprisonment.

Saleem contends (1) there was insufficient evidence to support a finding of premeditation, (2) he was denied his right to confront and cross-examine witnesses against him, (3) there was erroneous admission of a videotaped interview of a witness, (4) there was juror misconduct, (5) the court erred in denying his motion for judgment of acquittal, and (6) the court erred in failing to instruct the jury on the duty to retreat.

We will consider each issue but hold none require reversal.

Facts

Where insufficient evidence is alleged, it is necessary to set forth sufficiently detailed facts to show the events and how they were viewed by the parties involved, although our summaries do not show all of the evidence presented.

Saleem, also known as Rock, went to his sister Rahneisha's house in Topeka, where a party began with people drinking and listening to music. Todd Schmidt, also known as the T-man or Todd, was also at the party.

Sometime around 1 a.m., Saleem and Schmidt were talking and an argument began over who had known a third party the longest. They stepped outside. A shoving and pushing match took place. After Saleem fell, he pulled out his gun and shot Schmidt four times at close range, which resulted in his death. Saleem ran from the scene.

After being charged with first-degree premeditated murder, the defense theory was that Schmidt asked Saleem to "come outside," Schmidt hit Saleem with a liquor bottle, Saleem fell and saw Schmidt coming toward him with the bottle, and Saleem pulled out his gun and shot Schmidt in self-defense.

Arnett Rice was Rahneisha's roommate. She testified that while leaving with Pete Hill to get some cigarettes she saw Saleem and Schmidt on the front porch talking to each other in a "normal tone." Rice saw "they [Saleem and Schmidt] was pushing each other." Rice testified that shortly thereafter, Saleem fired four shots directly at Schmidt at rapid succession. Rice saw nothing in Schmidt's hand and never saw Schmidt try to strike Saleem. She and Hill saw Saleem run away from the scene.

Rice testified there was little time between the pushing and the shooting. The only comments she heard was when they were arguing over who had known Hill the longest. Rice admitted to drinking the day Schmidt was killed and to passing out at the police station.

Pete Hill testified that Schmidt came with him to Rahneisha's house where he and Schmidt shared a bottle of liquor. When leaving with Rice to get some cigarettes, he saw Schmidt and Saleem yelling at each other and then saw "Rah-maan [Saleem push] Todd first" with "both hands."

Hill testified that Schmidt then pushed Saleem harder and Saleem fell down. Saleem sprung up with a revolver and fired off three shots directly at Schmidt. Schmidt was holding a bottle of Schnapps, but he did not see Schmidt "make any threatening gestures" towards Saleem. Hill said the gun was "less than inches" away from Schmidt's body when it was discharged. Hill testified that Rice ran toward the pair, yelling at them to stop. He got in his car and left.

Saleem testified to being at his sister's house drinking earlier in the evening. Sometime after midnight, and after receiving a drink from Schmidt's bottle, he was told that [Schmidt] "was talking shit on me, that's what they said, said he was going to fuck me up." Saleem testified that Schmidt asked him to come outside, where they got into an argument and Schmidt started hitting him on the

head with a bottle. Saleem remembers pushing and being pushed by Schmidt and being hit and made to stumble back. Saleem pulled his gun and shot Schmidt as Schmidt came after him with the bottle. He could not remember how many times he shot because Schmidt continued to attack him.

After the shooting, Saleem ran to his mother's house and then left. On cross-examination, Saleem testified he felt "disrespected" when "[Schmidt] hit me with the bottle." He admitted to "feeling good," but said he did not go to the porch to enter into a confrontation with Schmidt. He did not know where he shot Schmidt and only remembered firing the gun twice. He testified that he did not intend to kill Schmidt and did not know Schmidt had died until later that morning. He admitted to knowing that guns were dangerous, and when asked whether Schmidt was trying to kill him, he responded, "I wouldn't say kill me but was trying to hurt me; that's what I thought, yeah."

The Shawnee County Coroner, Dr. Erik Mitchell, testified death occurred from the shots in Schmidt's chest, with soot and stippling of the skin around the holes, showing the gun had been discharged at close range. Two shots entered the left shoulder and two entered the chest.

Marlin Taylor, who attended the party, testified but was unable to remember much of the evening's activities. The trial court allowed him to be declared a hostile witness. Defendant's counsel objected that this would preclude effective cross-examination. Eventually, a videotape of Taylor's interview by a police officer was admitted into evidence. It contained a statement of prior criminal activity prejudicial to Saleem that was heard by the jury. There was information concerning gang membership on the videotape that defendant desired to use to substantiate his claim of self-defense. The trial court was concerned because it appeared Taylor was sufficiently irresponsive on the stand so that effective cross-examination would be unlikely.

The jury was instructed as to the crime of first-degree murder and the lesser included offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter. Several self-de-

fense instructions were given. Instruction No. 4 stated that premeditation means "to have thought over the matter beforehand."

Saleem was found guilty of first-degree premeditated murder and was sentenced to life imprisonment without chance of parole eligibility for 25 years.

*There was sufficient evidence to establish premeditation.*

Saleem first argues there was insufficient evidence to justify the jury's finding of premeditated first-degree murder.

When confronted with a sufficiency of the evidence argument, we look to our standard of review, which is " 'whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' " *State v. White,* 263 Kan. 283, 293, 950 P.2d 1316 (1997). We look only to evidence in favor of the verdict to determine if the essential elements of a charge are sustained. *State v. Patterson,* 243 Kan. 262, Syl. ¶ 1, 755 P.2d 551 (1988).

In *State v. Rice,* 261 Kan. 567, 587, 932 P.2d 981 (1997), we cited *State v. Henson,* 221 Kan. 635, 645, 562 P.2d 51 (1977), stating that "[p]remeditation is the process of simply thinking about a proposed killing before engaging in the homicidal conduct." We further stated in *Rice* that "[p]remediation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one. In such case, the jury has the right to make the inference." 261 Kan. at 587.

In defining first-degree murder, K.S.A. 21-3401 states it is "the killing of a human being committed: (a) Intentionally and with premeditation." Saleem seizes on our definition of premeditation in *State v. Thompkins,* 263 Kan. 602, 609, 952 P.2d 1332 (1998), as representing a change from our prior definition, *i.e.,* "premeditation means to have thought over the matter beforehand." *Thompkins* used the definition of premeditation found in *State v. McGaffin,* 36 Kan. 315, 319, 13 Pac. 560 (1887): Premeditation "means that there was design or intent before the act; that is, that the accused planned, contrived, and schemed" before killing the victim.

The *Thompkins'* definition was based on homicide definitions discussed in PIK Crim. 3d 56.04(b) (1994 Supp.). However, the correct PIK instruction is not from the 1887 *McGaffin* case but rather states that "premeditation means to have thought over the matter beforehand." The language in *McGaffin* is only of historical interest.

Premeditation "is a state of mind" relating to a person's reasons and motives for acting as he or she did. Saleem does not complain about the instruction given but rather attempts to bolster his argument of insufficient evidence by suggesting a different definition of premeditation exists from what we have used in recent cases. We hold it does not.

In *State v. Sanders*, 258 Kan. 409, 414, 904 P.2d 951 (1995), we recognized that premeditation may be inferred from the circumstances established provided they are reasonable; if so, the issue then becomes a jury question. We further stated:

"We have held that the element of premeditation is not inferred from use of a deadly weapon alone, but if additional circumstances are shown, such as lack of provocation, the defendant's conduct before and after the killing, or the striking of a lethal blow after the deceased was rendered helpless, the evidence may be sufficient to support an inference of premeditation." 258 Kan. at 414-15.

In this case, the State argues that three factors support an inference of premeditation. First, the use of deadly force was not justified. While there is evidence that Saleem instigated the pushing incident, there is also evidence that Schmidt was the aggressor. Saleem admitted he did not believe that Schmidt was trying to kill him, and deadly force was used to respond to nothing more than a push.

The State further contends the number of gunshot wounds and the location of those wounds support premeditation. Saleem testified he knew the dangerous effect of guns and that if one was shot there was a good chance of death. By firing four shots at close range, two in an area likely to be fatal, the State argues the jury could have found there was a premeditation to kill.

Finally, the State argues that while Saleem did not have a duty to retreat, the fact that he did not do so is an indication of his intent to act.

There is no evidence that Saleem had made any threatening statements or that he fired the lethal shot after Schmidt was rendered helpless. Saleem's action in running from the scene is an element that can be considered under our *Sanders* statement, and this may infer premeditation. Saleem argues leaving the scene can only be evidence of state of mind after and not before the killing.

In the final analysis this was an issue for the jury to determine, and we cannot make a decision contrary to its finding because there is sufficient evidence to have found Saleem guilty beyond a reasonable doubt. Testing the evidence as we are required to do, Saleem instigated the pushing, he ran from the scene, and he had sufficient time to consider his actions as he arose from the ground and drew his weapon and fired not one but four shots. It is also of note that Saleem admitted he thought Schmidt only meant to hurt and not kill him. Any justification for using deadly force could have been disregarded by the jury. We hold that based on consideration of the evidence in the light most favorable to the prosecution, a rational factfinder could have found the defendant guilty beyond a reasonable doubt of first-degree premeditated murder.

Saleem also contends the prosecutor's closing arguments misstated the law when he said to the jury:

"The defendant thought about it before he did it. He thought about it on the ground before he shot him, he intended to kill him while he was on the ground before he shot him. He thought about it in that two seconds beforehand and that's all you need, that he thought about it beforehand."

Saleem argues our statement in *State v. Moncla*, 262 Kan. 58, 72, 936 P.2d 727 (1997), that it was error to instruct a jury that premeditation "may arise in an instant" makes the statement above erroneous. First of all, the instruction was not approved in *Moncla*, but adding the wording was deemed harmless error. The State further contends that we have said in *State v. Hamons*, 248 Kan. 51, 62, 805 P.2d 6 (1991), and *State v. Kingsley*, 252 Kan. 761, 851 P.2d 370 (1993), that an instruction was proper which stated that premeditation requires no particular time frame.

*Moncla* is, as we stated, a jury instruction case. In this instance the statement referred to above was argued in an attempt to bolster

the lack of substantial evidence argument. It was not claimed to be prejudicial or to constitute prosecutorial misconduct. In addition, it was not objected to. This argument does not prevent the issue of determining premeditation as being one for the jury. In this case, the jury was properly instructed on the lesser included offenses and had sufficient evidence to find Saleem guilty of premeditated first-degree murder.

*Was Saleem denied his Sixth Amendment right to confront the witnesses against him? Did the trial court err in denying Saleem's motion for a mistrial based on the introduction of witness Taylor's videotape interview with Detective Wywadis?*

Saleem raises two separate issues concerning the testimony of witness Marlin Taylor. He first contends he was denied the right of effective cross-examination as required by the Sixth Amendment to the United States Constitution when Taylor could not remember at trial matters he had related to police shortly after Schmidt's death. The parties later, by agreement, introduced a videotape of Taylor's interview with the police which unfortunately contained a prejudicial statement suggesting this was not the first time Saleem had shot somebody. We consider the issues together as they are intertwined and involve the testimony and interview of a single witness.

Our standard of review of a claimed violation of the Confrontation Clause of the United States Constitution because of the "unavailability" of a witness is a question of law, which we review de novo. *State v. Johnson-Howell*, 255 Kan. 928, 938, 881 P.2d 1288 (1994).

As to Saleem's contention that the trial court erroneously denied his motion for a mistrial based on the introduction of Taylor's videotape interview, this decision lies within the sound discretion of the trial court and will not be reversed by an appellate court absent a clear showing of abuse of discretion. See *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 8, 807 P.2d 86 (1991). We have further stated: "The judge's power to declare a mistrial is to be used with great caution, under proper circumstances, to ensure that all parties receive a fair trial. When an event of prejudicial misconduct, the damaging effect of which cannot be removed by admonition and

instruction, is presented to a jury, the trial judge should declare a mistrial." *State v. Chandler*, 252 Kan. 797, 801, 850 P.2d 803 (1993). "[The] defendant has the burden of proving he was substantially prejudiced by a trial court's decision." *State v. Hammon*, 245 Kan. 450, 456, 781 P.2d 1063 (1969).

Taylor had been at Rahneisha's residence at the time the shooting took place but was not an eyewitness. After being called by the State and answering a few general questions, Taylor's answers became "I don't know" and "I don't remember." When the State requested Taylor be declared a hostile witness so the State could ask leading questions, defense counsel's first objection was that the witness was being asked questions outside of his knowledge or memory.

The trial court overruled the objection and allowed the State to lead Taylor. When Taylor was asked about prior statements to police officers, the answers continued in the same vein. Finally, when Taylor was asked whether he had told an officer that Saleem had been bragging about "smoking" people, defense counsel objected that the questions were prejudicial, irrelevant, and denied him the right to confront and effectively cross-examine the witness. The trial court overruled this objection, and Taylor was asked additional leading questions, to which he gave mostly nonresponsive answers.

During the next recess, the issue was again raised by defense counsel that the right to cross-examination would be effectively impaired, and it was suggested the witness was "constructively unavailable." The trial judge asked counsel's suggestion to rectify the situation. At this point, defense counsel stated: "From a practical standpoint of view, the floodgates are open. We ought to be able to ask him anything we want to ask him under that—that's in the reports, Wheeles, Haggard's, Wywadis, and the video." Wywadis had interviewed Taylor and the interview was taped.

Defense counsel advocated opening up all of Taylor's testimony and, while stating that this did not solve the confrontation problem, argued it would allow unlimited cross-examination. The trial court and counsel agreed that all prior interviews with Taylor would be admissible, and when the State suggested playing the videotape interview for the jury, the defense did not object.

It appeared to be the defense's theory that it was to Saleem's advantage to portray the victim as a gang member who instigated a confrontation with Saleem. This would have the effect of advancing his theory of self-defense. The videotaped statement contained Taylor's comments about the victim and Saleem's gang affiliation and suggested a controversy might exist over seniority. Unfortunately, although both the prosecutor and defense counsel had previously reviewed the tape, there was a statement by Detective Wywadis near the end of the tape that said "this isn't the first time that Rock has shot somebody." This was played to the jury.

With the above background, we first consider whether it was reversible error for Taylor to be allowed to testify under the circumstances stated.

The State first argues there was not a timely objection. It is true that the correct objection was not initially made; however, it was clearly made at the bench conference. In addition, in doing so, Saleem's counsel asked that all of Taylor's statements be admissible so they could "ask him anything we want to ask him."

A defendant cannot open up an issue at the trial and use unrestricted statements to his or her advantage and then on appeal, after an unfavorable result is obtained, contend the trial court's ruling to be erroneous. We said in *State v. Plunkett*, 261 Kan. 1024, 1033, 934 P.2d 113 (1997), that " '[a] litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal.' " (citing *State v. Prouse*, 244 Kan. 292, 298-99, 767 P.2d 1308 [1989]). It was sound strategy to bolster the self-defense argument. Taylor was certainly a difficult witness, but Saleem's defense team used him to their advantage and cannot now say the right of confrontation was violated.

Had Saleem not attempted to use all of the statements and interviews of Taylor to his advantage and confine his objections to the denial of confrontation, a much more difficult problem would exist, as we have discussed in *State v. Johnson-Howell*, 255 Kan. 928, 938-44, 881 P.2d 1288 (1994), and *State v. Lomax & Williams*, 227 Kan. 651, 660, 608 P.2d 959 (1980). There might have been a lack of confrontation under different circumstances, but not as exist

in this case. However, the record reflects a stragetic decision was made to utilize all of Taylor's statements, and having done so, Saleem is now subject to the invited error rule as previously stated.

After the videotape was played for the jury, defense counsel moved for a mistrial, complaining the State knew of the prejudicial statement made by Detective Wywadis and "did nothing to redact it." The State responded that defense counsel had the tape and had reviewed it, and it was not the State's responsibility to tell the defense what should be left out. Defense counsel admitted that although the tape had been reviewed twice, the prejudicial statement by the detective had been missed.

The State asked the trial court to instruct the jury to disregard the statement, but Saleem opposed such instruction, stating: "Judge, we are not going to request a curative instruction but I will clean that up with [Wywadis' testimony] to our satisfaction."

The trial court denied the motion for mistrial, stating that the tape was furnished 2 weeks prior to its introduction into evidence, the defense admitted to reviewing the tape twice, and there was no showing of any deliberate conduct, attempt to run this before the jury with surreptitious type conduct, that sort of thing. The trial proceeded without an instruction to the jury.

Saleem now contends the trial court erred when it denied his motion for a mistrial and he was substantially prejudiced. Additionally, Saleem argues the prosecutor has an independent duty to ensure that only competent evidence is introduced at trial and must guard against anything of an erroneous and prejudicial nature. See *State v. Ruff*, 252 Kan. 625, Syl. ¶ 6, 847 P.2d 1258 (1993).

The State argues, much as it did at trial as to the questioning of Taylor, that Saleem did not object to the playing of the tape, wanted to examine Taylor on everything in the tape, had a copy of it, failed to object when the comment was made, and did not accept an offer of admonishing the jury. The State further argues this can only be considered invited error, again citing *Plunkett*, 261 Kan. 1024.

There is no question that the statement was prejudicial; however, it was known to the defense to exist, and while 20-20 hindsight might now suggest it was an erroneous trial strategy, it was

at the time a valid manner of bolstering Saleem's claim of self-defense. It would certainly have been better to have the statement redacted, and the trial court would have undoubtly done so had it been so requested. Because it was not requested, we do not find it to be reversible error, and the trial court did not abuse its discretion in denying Saleem's request for a mistrial.

Additionally, we do not hold this to be prosecutorial misconduct. *Ruff* involved an improper remark to the jury during closing arguments situation. It is not applicable to the facts of our case. We are not constrained to impose on the prosecution the obligation of making determinations which invade the manner in which a case is defended. The give and take of the adversary system must be allowed to work during the trial process. The trial court did not abuse its discretion in failing to grant a mistrial.

*Did the trial court err in failing to conduct interviews with jurors concerning racial remarks allegedly made by members of the jury pool prior to trial?*

Saleem argues the trial court erred in denying the State's motion for a mistrial based upon alleged juror misconduct, although the record reflects he specifically opposed the granting of a mistrial and argued the trial should be finished. Our standard of review concerning this issue was set forth in *State v. Heiskell*, 21 Kan. App. 2d 105, 109, 896 P.2d 1106 (1995), in the following manner:

" ' "Misconduct of jurors *per se* does not necessitate a new trial, but misconduct which results in prejudice to a litigant and impairs his right to a fair and impartial trial requires a new trial. [Citations omitted.] It is for the trial court to determine in the first instance whether misconduct on the part of the jury has resulted in prejudice to a litigant, and its judgment thereon will not be overturned unless abuse of discretion is manifest." ' "

After the trial had begun, a proceeding was conducted in chambers with the defendant's counsel, counsel for the State, and juror M. The trial judge informed juror M. that the public defender's office had received a phone call the previous night from a member of the jury pool who had not been selected but had overheard a conversation discussing bias against black people. The caller reported one of the prospective jurors said: "I don't like niggers, . . . and I am glad I am not on the jury," and that she heard

juror M. join in and say: "I am surprised that I am on this jury because I work for the K.B.I., my husband is a Sheriff's officer, and I don't like the niggers either."

Juror M. vehemently denied making any racial remarks, saying, "Oh, my goodness, no." She stated there were two older women behind her who had spoken of being prejudiced and glad they were not called. Juror M., in response to a question of whether she had made the reported comment, stated: "No way. That's what this is all about? She said it behind me, see, and her face was right here when she said that. I am about to have a heart attack here. No, I never said that."

After juror M. was excused, the State moved for a mistrial, but defense counsel adamantly opposed granting the motion, stating, "I don't think there is a ground or basis for a mistrial on what you have just told us." He further stated, "Rock's been in jail since February; we want this trial, we want this trial this week, and we want it right now."

When the State expressed concern about the allegation, Saleem was brought into chambers and informed by his counsel of the situation. Saleem waived the jury's prejudice and affirmed his counsel's desire to proceed with the trial.

There was some discussion concerning voir dire of the other jurors, but defense counsel stated there was no need for that, saying "there is just no evidence of any sort . . . that those people are affected in any way. It's just not there, it is just not there."

On appeal, Saleem claims the potential taint of the jury panel was not explored; the trial court abused its discretion in not examining each juror; and there is an independent duty on the trial court to have further examined the issue, the failure of which constitutes an abuse of discretion.

The State argues Saleem's position is indefensible because he failed to preserve his right to appeal, the cases requiring a trial court to proceed independently of counsel's wishes are distinguishable, and there is no showing the trial court abused its discretion.

This issue is without merit. In *State v. Wheaton*, 240 Kan. 345, 354, 729 P.2d 1183 (1986), we stated:

"In Kansas, a rule has been adopted that where alleged juror misconduct claimed as prejudicial is known by the party or his counsel before the verdict is rendered, and no objection is made nor is the matter brought to the court's attention, the party cannot later assert the misconduct as grounds for a new trial."

Additionally, the cases cited by Saleem on appeal, *Rosales-Lopez v. United States*, 451 U.S. 182, 68 L. Ed. 2d 22, 101 S. Ct. 1629 (1981), and *Ham v. South Carolina*, 409 U.S. 524, 35 L. Ed. 2d 46, 93 S. Ct. 848 (1973), are both distinguishable and do not support Saleem's contention. In this case, defense counsel at trial asserted there was no evidence to support a taint of the jury, wanted to continue, and got exactly what he wished. The trial court properly refused the State's motion for mistrial.

*Did the trial court err in denying Saleem's motion for judgment of acquittal on the charge of first-degree premeditated murder?*

The arguments made in contending a judgment of acquittal should have been granted are essentially the same arguments that were made in contending that there was insufficient evidence to convict Saleem on premeditated first-degree murder. As we said previously in our comments on the first issue, there was ample evidence to present this issue to the jury. Because it was an issue to be submitted to the jury, the motion for acquittal was properly denied.

*Did the trial court err in failing to give the defendant's proposed instruction on no duty to retreat?*

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction." *State v. Sims*, 265 Kan. 166, Syl. ¶ 1, 960 P.2d 1271 (1998).

Saleem requested that the following instruction be given to the jury: "When confronted by an aggressor one may stand his ground and need not retreat." While the trial court did not give the instruction, citing *State v. Ricks*, 257 Kan. 435, 894 P.2d 191 (1995), the court did, however, instruct the jury:

"No. 8
"The defendant has claimed his conduct was justified as self-defense.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

The trial court also gave instruction No. 10, which stated:

"The defendant raises self defense as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

Saleem recognized the authority of *Ricks*, 257 Kan. 435, but claims his factual situation is more akin to the facts in *State v. Scobee*, 242 Kan. 421, 748 P.2d 862 (1988), and would require the requested instruction to have been given.

The State acknowledges that where the attack took place at the defendant's residence, an instruction of no duty to retreat might be required, but contends our case is factually different from *Scobee*.

In *Scobee*, two aggressors followed the defendant to his home. While he was parked in his driveway, the aggressors approached him in a threatening manner, with one of them waving an iron pipe. The defendant shot and killed one of the aggressors with a rifle. The prosecution had built its case upon the theory that the defendant had a duty to retreat, and defense counsel was precluded from arguing Scobee had no duty to retreat from his own driveway. Scobee's conviction of involuntary manslaughter was reversed for failing to give an instruction that he had no duty to retreat from the attack upon him.

The facts in *State v. Ricks* are very different. There, we held that a no duty to retreat instruction was not required. The defendant was approached by two victims in a public parking lot. The defendant had a gun. The victim drove up beside defendant's car and a short conversation ensued. The defendant shot each victim three times. Prior to approaching the defendant, one of the victims had said to an occupant in the defendant's car that "he would like to beat defendant's ass.' " 257 Kan. at 436.

We held in *Ricks* that "[t]he no duty to retreat instruction is required, as indicated in *Scobee,* in infrequent factual situations such as found therein with such elements as a nonagressor defendant being followed to and menaced on home ground." 257 Kan. at 437. Although the confrontation took place at Saleem's sister's house, it is factually different from *Scobee* and is much more akin to *Ricks.* The trial court correctly refused to give the no duty to retreat instruction.

Saleem's conviction is affirmed.

ALLEGRUCCI, J., concurring: I concur with the result reached by the majority but disagree with Syl. ¶ 2, which states that "premeditated" means "to have thought over the matter beforehand." (PIK Crim. 3d 56.04[b].)

Murder in the first degree is the killing of a human being committed intentionally and with premeditation. K.S.A. 21-3401. Second-degree murder is the killing of a human being committed intentionally. K.S.A. 1998 Supp. 21-3402(a). By defining "premeditated" as simply meaning "to have thought over the matter beforehand," the majority has effectively converted second-degree murder to first-degree murder. "Intentionally" is defined as meaning "conduct that is purposeful and willful and not accidental. Intentional includes the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose.'" PIK Crim. 3d 56.04(d). How does one *intentionally* kill another human being without thinking about it beforehand? The jury is also instructed that if it does not find the defendant guilty of first-degree murder, then it should consider the lesser offense of second-degree murder. It is difficult to comprehend how a jury so instructed would ever consider the lesser included offense of second-degree murder.

As noted in the majority opinion, this court has used words such as "plan," "contrive," and "schemed beforehand" to define premeditation. This court has required that a defendant not only think it over beforehand, but also to come to the conclusion that he or she would kill the victim and then do so. The majority, by approving PIK Crim. 3d 56.04(b), has, in my opinion, essentially repealed 21-3402(a).