No. 84,449

STATE OF KANSAS, *Appellee*, v. FRANK DIETERMAN, *Appellant*.

(29 P.3d 411)

Opinion filed July 20, 2001.

*William K. Rork*, of Rork Law Firm, of Topeka, argued the cause, and *Michael Gayoso, Jr.*, and *John A. Fakhoury*, legal intern, of the same firm, was with him on the brief for appellant.

*Kristafer Ailslieger*, assistant attorney general, argued the cause, and *John Bork*, assistant attorney general, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Frank Deiterman was convicted by jury of capital murder, K.S.A. 21-3439(a)(2), conspiracy to commit capital murder, K.S.A. 21-3302 and K.S.A. 21-3401, and aggravated robbery, K.S.A. 21-3427. He was sentenced to life with the possibility of

parole in 40 years on the first count, pursuant to K.S.A. 21-4638, 154 months on the second, and 51 months on the third, with each sentence to run consecutively. Deiterman raises 10 issues relating to venue, evidentiary matters at trial, and sentencing. He appeals directly to our court pursuant to K.S.A. 22-3601(b)(1).

Factual background

On January 29, 1998, James Patrick Livingston was found dead outside his rural home in Cherokee County, Kansas. He died as a result of two shotgun blasts; one shot was more distant with pellets hitting the head and face, and the second and certainly fatal shot was at close range and to the back of the head.

The State's evidence showed Livingston's death was the result of a murder-for-hire scheme, initiated by his wife, Pamela Livingston. The State's key witnesses were two of the four alleged co-conspirators, Alton Richard Sheffield, Mrs. Livingston's brother-in-law, and Darrell Wilkerson, the fiancé of Sheffield's daughter.

Sheffield testified Mrs. Livingston asked him to kill her husband. He agreed but demanded money, and she gave him approximately $2,500.

On January 26, 1998, Sheffield was traveling with Deiterman and Wilkerson to retrieve his broken-down vehicle in Texas. While they smoked crack cocaine, the topic of monetary debts arose. Sheffield explained that he knew of a woman who would pay money for her husband to be killed. Once the others agreed to participate, he explained that the woman was Mrs. Livingston. Deiterman volunteered to be the shooter.

The next day they went to Deiterman's father's house to pick up guns. They drove from Victoria, Texas, to Joplin, Missouri, stopping overnight in Oklahoma. Drugs were purchased and used during the trip.

Upon arriving in Joplin, Sheffield met Mrs. Livingston alone in a hotel where he was given $300 cash and a $25,000 check. After Wilkerson and Deiterman returned, they bought several items in preparation for the murder and purchased and used more crack cocaine. Sheffield agreed to pay Wilkerson and Deiterman $7,000-

$7,500 for their roles in the crime. He also gave them $100 apiece from the $300 he received earlier.

Mrs. Livingston called the hotel room around midnight and asked Sheffield to meet her at the hospital. Her son and nephews were taken there after being injured in an automobile accident. Mrs. Livingston explained that the killing would need to happen that night. She gave him a map to her home and told Sheffield the best location to hide. She explained that she would call Mr. Livingston in the early morning to relieve her at the hospital, and when he came out of their house he could be ambushed.

Sheffield picked up Deiterman and Wilkerson, and Sheffield dropped them off at the victim's house. He heard two shots and then came back to pick them up. Deiterman and Wilkerson had a billfold when they entered the vehicle. In the car, Deiterman stated that it was a "rush" to kill the victim and that he would have done it for free. Deiterman asked Sheffield if he knew the last thing that went through the victim's mind. Deiterman then stated, "lead." The three put the guns in a culvert and threw the remaining evidence such as clothing and ammunition out the car window on their drive back.

Although not privy to any of the conversations with Mrs. Livingston, Wilkerson's testimony confirmed all the above facts and supplemented the version of events as given by Sheffield. Wilkerson testified that Deiterman was the shooter. Deiterman first shot the victim once from a distance of about 10 feet, and after the victim fell face down, Deiterman stood over him and shot him in the head. Deiterman then grabbed the victim's wallet. The money was taken from the wallet, and the empty wallet was thrown out the car window.

Three other witnesses confirmed that Deiterman, Sheffield, and Wilkerson were gone for several days some time during the end of January 1998. Those witnesses were Meghan Deiterman (the girlfriend and now the wife of Frank Deiterman), Ricki Wilkerson, and Jamie Sheffield (Alton Sheffield's daughters).

Deiterman testified in his own defense. He admitted to traveling with Sheffield and Wilkerson to pick up and fix Sheffield's car and that he stayed one evening with the two. He also admitted to smok-

ing crack cocaine with them, although he stated it was his first time using the drug. He claims to have spent the other evenings in question with friends and sleeping at his father's house.

Other facts will be discussed as they relate to the specific issue raised.

## Change of venue

Initially, Deiterman argues that his motion for change of venue was improperly denied by the trial court. He alleged newspaper articles and television reports had presented to the public incompetent and prejudicial evidence, especially two articles which used the phrases "a blood thirsty killer" and "the alleged triggerman." He contends prospective jurors have been biased and prejudiced to a point where he could not receive a fair trial.

We have recently stated our standard of review for motions to change venue:

"The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. [Citation omitted.] The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial. [Citation omitted.]" *State v. Anthony*, 257 Kan. 1003, 1013, 898 P.2d 1109 (1995).

The trial court denied the motion for a change of venue, finding that the defense had failed to meet its burden to show that Deiterman's rights would be substantially prejudiced by not changing the venue.

The defense pointed to articles from newspapers in Joplin, Missouri, and Pittsburg, Kansas, but none were from the local Columbus, Baxter Springs, or Galena newspapers. The articles reflected facts that were shown in the charging documents and during trial proceedings of all the codefendants. Two articles used language that was inflammatory but was qualified as comments made by prosecutorial witnesses and not represented as pure fact in stating: "Prosecutors presented testimony that Deiterman was the blood-

thirsty trigger-man in the killing . . . . Deiterman's lawyers counter that he has been set up by his co-conspirators."

The defense failed to produce affirmative evidence that public opinion had actually been swayed in Cherokee County by these reports. As is well established in Kansas law, "[m]edia publicity alone has never established prejudice per se." *State v. Cravatt*, 267 Kan. 314, 336, 979 P.2d 679 (1999). The trial court did not abuse its discretion in denying Deiterman's initial motion.

Second, Deiterman argues that the trial court erred by not ordering a change of venue *sua sponte* after the jury selection process had begun. As authority for his position, he cites *In re Habeas Corpus Petition of Hoang*, 245 Kan. 560, 564, 781 P.2d 731 (1989) *cert. denied* 494 U.S. 1070 (1990), and *State v. Alston*, 256 Kan. 571, 574-75, 887 P.2d 681 (1994).

Neither case is supportive of Deiterman's argument. *Alston* was an appeal by a newspaper and its publisher of their convictions of indirect contempt for violating a gag order. In discussing the facts of the underlying criminal case, we noted that the trial court changed the venue of the case *sua sponte* due to publication of information about the defendant by the local paper. The statement is merely a recitation of facts without any accompanying comment as to whether the lower court's actions were proper. The decision has no application to Deiterman's contention.

In *Hoang*, a judge declared a mistrial *sua sponte* after discovering a preexisting attorney-client relationship between defense counsel and a key prosecution witness. In affirming the court's proactive conduct, our court opined that a "judge has a duty to maintain the integrity of the administration of the justice system." 245 Kan. at 562. *Hoang* was merely a review by this court of the *sua sponte* actions of a trial court and has no application to the present facts.

While the issue could have been revisited during voir dire, defense counsel passed the jury for cause and cannot now claim that Deiterman is entitled to a new trial based on invited error and issues not raised below. See *State v. Saleem*, 267 Kan. 100, 109, 977 P.2d 921 (1999).

Deiterman finally argues, without citing any supporting authority, that a more stringent standard should be applied when consid-

ering motions to change venue in capital murder cases. We see no reason to apply a stricter standard in the present case.

*Improper comments during voir dire*

Deiterman next argues, without clearly specifying to the record, that the trial court erred by not instructing the venire *sua sponte* to disregard prejudicial statements made by other venirepersons during voir dire. Deiterman discusses only two members of the venire who made comments that might in some way be considered prejudicial. Deiterman admits that no objection was raised and that the court was never asked to instruct the jury to disregard any comments, but he claims that this court may nevertheless consider the matter because the record reveals plain error.

We have previously applied the plain error rule only to improper comments made by the prosecution to the jury during closing arguments. See *State v. McCray*, 267 Kan. 339, 344, 979 P.2d 134 (1999).

The defense has failed to allege, nor does the record reflect, that the alleged prejudicial statements heard by the venire were in any way a result of prosecutorial misconduct. After Danny Jacquinet stated during voir dire that he was leaning toward a guilty verdict, the prosecution quickly admonished him in front of the other members of the jury pool:

"MR. BORK: This is the type of thing we may need to talk about because you realize that what you have heard is not evidence?

. . . .

"MR. BORK: And you hear a lot of things, some may be true and some may not be true. You may have heard things that will not be presented in this trial. So right now you have not heard any evidence that would overcome the presumption of innocence, you understand that?

. . . . .

"MR. BORK: . . . Do you understand that you have to set [your opinion] aside and you can't rely on what you've heard?

. . . .

"MR. BORK: And of course if we didn't—prior to us presenting any evidence or prior to us presenting any testimony, given the fact the defendant has a presumption of innocence, if you had to vote then . . . you would have to vote not guilty; do you understand that?"

Not only did Jacquinet answer each one of these questions affirmatively, but the comments were made in the presence of the entire venire. These actions are not prosecutorial misconduct, nor can we conclude that Deiterman's rights were in any way prejudiced by this exchange.

The second comment cited by Deiterman was one made by venireperson Thomas Dietz. After defense counsel stated that he was going to ask the venire what it specifically had heard from the media, the State objected. The State argued that such comments may prejudice and taint possible members of the jury. The court admonished the defense counsel and warned him that he would have to "live with the consequences." Defense counsel proceeded to ask each juror if what he or she had heard had caused them to think that Deiterman might be guilty. After directly soliciting a comment from Dietz about an article that the defense counsel claimed contained "sensationalist language," Dietz expressed that the article's content would sway him toward thinking that Deiterman was guilty.

Any resulting error was clearly invited. Furthermore, having failed to move the court to instruct the jury, the issue was never raised below and this court will not now consider it. *State v. Smith*, 268 Kan. 222, 242-243, 993 P.2d 1213 (1999).

Deiterman's argument for error during voir dire lacks both legal and factual support.

## Impeachment of Meghan Deiterman

Deiterman next argues the district court erroneously sustained the State's objection to stop his impeachment of Meghan Deiterman with the facts that she was on probation and suffering from bipolar disorder.

"Under K.S.A. 60-401(b), relevant evidence is evidence 'having any tendency [in reason] to prove any material fact. For evidence of collateral facts to be competent, there must be some material or logical connection between them and the inference or result they are designed to establish.' " *State v. Walker*, 239 Kan. 635, 644, 722 P.2d 556 (1986) (citing *State v Reed*, 226 Kan. 519, 524, 601 P.2d 1125 [1979])." *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Further, in regard to our standard of review of such evidence, we stated:

"The admissibility of evidence lies within the sound discretion of the trial court. In *State v. Sims*, 265 Kan. 166, 175, 960 P.2d 1271 (1998), the court stated that " 'it is clear that our standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion' " (quoting *State v. Sims*, 262 Kan. 165, 170, 936 P.2d 779 [1997])." *Lumley*, 266 Kan. at 950.

Meghan Deiterman was called as a witness by the State. On direct she was asked about her relationship with Frank Deiterman, whether he owed money to a Mexican man, details about his trip with Sheffield and Wilkerson, and whether she talked with John Barnes about Frank Deiterman's role in the murder. On redirect, the State tried to clarify the dates on which Frank Deiterman was gone, and the State also questioned her if Sheffield's girlfriend had visited her during the time the three men were gone. On recross, the defense counsel asked Mrs. Deiterman if she suffered from bipolar manic depressive disorder. The State objected stating, "beyond the scope." The defense made no further proffer. Defense counsel then stated, "You're on probation?" Meghan Deiterman answered affirmatively.

Deiterman now argues he should have been allowed to question Meghan Deiterman about her bipolar disorder because it is a matter affecting credibility. K.S.A. 60-420(b) states that "[s]ubject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her on any other matter relevant upon the issues of credibility." The defense made no proffer or in any manner attempted to show below how bipolar disorder affected credibility. This question is not properly before this court on appeal. *State v. Smith*, 268 Kan. at 242-43.

Deiterman's argument concerning restriction of his question to Meghan regarding probation fails to recognize that she did answer the question and admitted to being on probation. It was not an abuse of discretion to refuse to allow him to question her about it further.

*Hearsay statements concerning Deiterman's guilt*

We review this issue under an abuse of discretion standard of review. *State v. Lumley*, 266 Kan. at 950.

Deiterman contends the testimony of John Barnes about a statement made by Meghan Deiterman was inadmissible opinion testimony concerning Deiterman's guilt, and the trial court erred in overruling his objection to this testimony.

During the State's case in chief, Meghan Deiterman denied she had told John Barnes that Deiterman had killed Livingston.

The State later called John Barnes as a witness. He was asked about the conversation he had with Meghan Deiterman. When Barnes said he asked Meghan "if she actually thought he [had] done it?" the prosecutor then asked, "[a]nd what did she reply?"

At this point, the defense counsel objected that opinion testimony was about to be testified to by Barnes. The defense counsel argued that Meghan's opinion of guilt or innocence was irrelevant and highly prejudicial. The prosecution responded that the answer Meghan gave to Barnes' question was not an opinion, but rather she had stated that "he blew him away."

Barnes was questioned by the court, out of the presence of the jury, as to Meghan Deiterman's response. He stated that she responded, "[Y]eah, he blew his damn head off." The prosecutor pointed out that the statement was not one of opinion but rather a positive statement. The court decided that the answer was not an opinion but rather an emphatic statement. After resuming, the prosecution rephrased the question: "When you asked her about the murder in Kansas what was her comment, what did she say?" Barnes responded: "That he blew his damn head off."

On cross-examination, the defense counsel was able to obtain Barnes' statement that he had asked for Meghan's opinion.

Deiterman makes three arguments on appeal concerning the testimony of John Barnes, but the first two were not made in the trial court. First, he contends that Barnes' testimony was inadmissible hearsay under K.S.A. 60-460 with no applicable exceptions. Second, he argues that the only proper method to impeach Meghan's credibility was to confront her directly and not through

the testimony of Barnes, citing *State v. Sorter*, 52 Kan. 531, Syl. ¶ 5, 34 Pac. 1036 (1893), and *State v. Gauger*, 200 Kan. 515, 520, 438 P.2d 455 (1968). As stated in K.S.A. 60-404: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." Deiterman never challenged the propriety of the impeachment by prior inconsistent statement, nor did he object to the testimony as inadmissable hearsay. Neither of these arguments is properly before us.

The objection raised below and continued on appeal is that Meghan's statement, quoted by Barnes, was opinion testimony and totally irrelevant and highly prejudicial. Deiterman cites to several of our cases dealing with the admissibility and effect of expert testimony on questions of guilt and credibility, all of which are distinguishable from and irrelevant to the present case. See *State v. Steadman*, 253 Kan. 297, 855 P.2d 919 (1993); *State v. Cheeks*, 253 Kan. 93, 853 P.2d 655 (1993); and *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986). Deiterman also points to *United States v. Polsinelli*, 649 F.2d 793 (10th Cir. 1981), where the Tenth Circuit Court of Appeals found it error for the prosecution to ask a character witness if knowing the defendant was guilty would change his opinion. Again, that case is clearly distinguishable from our present facts.

The response is not one of an opinion of guilt or innocence but rather the emphatic positive statement, "[Y]eah, he blew his damn head off." Barnes' counsel artfully tried to turn this into an inadmissible opinion in his cross-examination. This is a close question, but we believe that it was correctly resolved by the trial court. It was certainly not an abuse of discretion to allow Barnes to answer the question as last propounded to him. This is not reversible error.

*Questioning Deiterman about his alibi defense*

Deiterman contends that it was reversible error for the trial court to allow the State to cross-examine him concerning his lack of evidentiary support for his alibi.

On direct, Deiterman admitted to going on an overnight trip on January 26, 1998, with Sheffield and Wilkerson in order to pick up and fix Sheffield's car. However, he denied going to Kansas with them, and he claimed to have spent the nights of January 27 though January 29 sleeping at his father's, and spending time socializing with friends. He also testified that during the days Wilkerson and Sheffield claim to have been in Kansas, he was making repairs on his or his father's vehicles.

During cross-examination, the State asked Deiterman if he purchased parts from an automotive supply store for the work he did on his pick-up truck. When Deiterman stated that he did, the State asked him if those stores produce a receipt every time a purchase is made. Deiterman responded affirmatively. The trial court overruled defense's objections that the State was attempting to shift the burden of proof to the defendant. After further questioning, Deiterman explained that the particular auto parts store from which he purchased the goods was owned by a man who usually does not make out receipts.

The State also asked Deiterman if he had produced any of the names of the individuals he spent time with during the week of the murder. After Deiterman stated he had not, the prosecutor then asked him if he sent anyone to talk to the people in the bar where he claimed he had been on those nights. Deiterman responded that he sent his attorney to the bar.

On appeal, Deiterman argues that the State had no right to question a defendant as to why evidence and witnesses were not produced to support an alibi defense, as such questioning impermissibly shifts the burden of proof to the defendant. In support he cites several cases in which our court considered alibi defenses in the context of jury instructions: *State v. McIver*, 257 Kan. 420, 431, 902 P.2d 982 (1995), *State v. Peters*, 232 Kan. 519, 520, 656 P.2d 768 (1983), and *State v. Skinner*, 210 Kan. 354, 361, 503 P.2d 168 (1972). Deiterman admits, and the record reflects, that no alibi jury instruction was given to the jury, nor has Deiterman challenged the jury instructions on appeal. Hence, the cases relied on by Deiterman do not support his contention.

The State argues that the cross-examination concerning Deiterman's failure to produce supporting evidence of his alibi was proper based on *State v. Wilkens*, 215 Kan. 145, 150-151, 523 P.2d 728 (1974), *State v. Mims*, 222 Kan. 335, 337, 564 P.2d 531 (1977), and *State v. Miller*, 259 Kan. 478, 481-83, 912 P.2d 722 (1996).

In *Wilkens*, the State rhetorically questioned the jury as to why the defendant did not produce two witnesses whose testimony the defendant claimed would be exonerative. We held that the prosecutor's argument was proper and opined:

"When the theory of the defense is based upon facts within the personal knowledge of a particular person or persons available as witnesses and no attempt to secure their testimony is made the failure to produce available evidence may give rise to an inference that it would be adverse to the party who could have produced it." 215 Kan. at 150-51.

In *Mims*, the prosecutor commented to the jury about the defendant's failure to produce more witnesses to support his alibi defense. The defendant claimed he was spending the evening in question with many family and friends, yet had only called his wife to the witness stand on his behalf. Citing *Wilkins*, we found that such comments were proper. 222 Kan. at 337-38.

Finally, in *Miller* we considered whether the State impermissibly commented on a defendant's post-release silence by questioning him about the length of time it took for him to produce alibi witnesses.

We hold that the prosecution did have the right to cross-examine Deiterman concerning lack of evidentiary support for an alleged alibi defense. The State's questions to Deiterman about the lack of receipts and alibi witnesses were proper.

*Prosecutorial misconduct during closing statements*

Deiterman contends that the prosecution committed reversible misconduct by enlarging part of the defense counsel's opening argument and using it during closing argument. Deiterman also argues that it was reversible misconduct for the prosecutor to allege that Deiterman and his father fabricated testimony about a phone call.

We recently recited our standard of review for alleged prosecutorial misconduct:

" 'The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal.' [Citation omitted.]" *State v. Campbell*, 268 Kan. 529, 539, 997 P.2d 726 (2000).

During the defense counsel's opening argument, he stated that the jury would be presented with evidence showing there was a collect phone call from Malvern, Arkansas, to Deiterman's uncle's home in Texas on Thursday afternoon after the shooting and that neither Deiterman nor his father knew anything about the call. During trial, Deiterman testified that he not only knew about the call, but that the call was actually for him and he received it while he was taking a shower at his uncle's house. He also testified that his father handed him the phone. His father, Harvey Deiterman, testified that he remembered receiving a collect call while he was at his brother's house and he handed the phone to Frank after he got out of the shower. He stated that the call from Malvern, Arkansas, listed on the phone bill may be the same call, but he was not certain.

During closing arguments, the prosecution quoted the portion of the defense's opening statement cited above. The prosecutor then continued,

"Apparently something strange happened between the defendant's opening statement and the defendant and Harvey Deiterman's testimony to you the other day. The State contends that Harvey Deiterman and the defendant's story to you about receiving a collect phone call and the defendant taking the call in the shower is completely fabricated. The truth is that the defendant called his father and his father accepted the collect call and they spoke."

First, Deiterman argues that the State should not have been permitted to quote portions of his opening statement during closing arguments. In support he cites *State v. Scott*, 250 Kan. 350,

356, 827 P.2d 733 (1992), and *State v. Brown*, 181 Kan. 375, 394, 312 P.2d 832 (1957). In *Scott*, a defendant argued that because the State relied on allegedly insufficient evidence in its closing, the trial court should dismiss the charge. Our court found that not only was the evidence relied upon by the State in its closing sufficient, but opening and closing arguments are not evidence. We did not hold in *Scott* that a party cannot use failed promises from opening arguments during closing. *Brown* is equally inapplicable. In *Brown*, we held that arguments of counsel cannot be relied on in determining the unavailability of a witness. 181 Kan. at 394.

The State counters that it would be nonsensical if parties were unable to comment on the arguments presented by either side. The State notes that in *Pickens v. Gibson*, 206 F.3d 988, 999 (2000), the Tenth Circuit Court of Appeals held that so long as a prosecutor does not comment on a defendant's failure to testify, he or she "is otherwise free to comment on a defendant's failure to call certain witnesses or present certain testimony." The State further argues that by pointing out the differences between what was said by Deiterman in his opening statement and what was actually presented at trial, it is arguing the evidence.

In *People v. Harris*, 47 Cal. 3d 1047, 255 Cal. Rptr. 352, 767 P.2d 619 (1989), the defendant contended that the prosecutor committed misconduct when citing discrepancies between his opening statement and what he presented at trial. The court summarily dismissed the defendant's contention:

> "While conceding that no authority supports his claim, defendant also argues that it was misconduct for the prosecutor to refer in closing argument to defense counsel's opening statement and to note the failure of the defense to 'deliver' by presenting evidence to support the outline he had drawn of the defendant's case.
>
> "This type of argument is proper and commonly used by counsel. The opening statement is one intended to assist the jury in understanding the evidence to come. While the jury is instructed that it is not evidence, the statement does offer a 'story line' into which the pieces of evidence should fit. It is totally proper to remind the jury in this way that the statement was inaccurate in that some of those pieces are missing and that the verdict should rest only on evidence that has been admitted." 47 Cal. 3d at 1085 n.19.

Applying the same logic in the present case, it was entirely proper under the present facts for the State to point out discrep-

ancies between Deiterman's opening statement and what was actually presented to the jury at trial.

Deiterman also argues that the prosecution in essence called him a liar by stating that the story surrounding the collect phone call was fabricated. At trial, the defense counsel only complained that the comments made it sound as if the defense had fabricated the story; no argument was ever made that these comments amounted to calling Deiterman a liar. "An issue not presented to the trial court will not be considered for the first time on appeal." *State v. Smith*, 268 Kan. 222, 243, 993 P.2d 1213 (1999). In addition, the prosecutor's statements clearly do not amount to any misconduct. In *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000), we held that it was improper for a prosecutor to interject personal opinion as to the credibility of the defendant or the State's evidence. Here, the prosecution never made any comments based on personal opinion concerning the credibility of Deiterman or the State's evidence. The prosecution merely drew a reasonable inference from the evidence that the story told by Deiterman about receiving the collect call was contrary to the testimony of several other witnesses. There was no prosecutorial misconduct.

*Cautioning Deiterman's father of potential criminal charges*

Frank Deiterman next contends the trial court committed reversible error when it advised his father, Harvey Deiterman, at the prompting of the prosecution, of his right to remain silent immediately prior to testifying for the defense.

Prior to calling Harvey to the stand, the State brought to the court's attention that criminal charges might be sought against Harvey based on testimony presented at trial by both the State and the defense and some evidence not presented at Frank Deiterman's trial. The State's comments were made in chambers out of the presence of Harvey. The court then asked for Harvey to be brought in and instructed him as follows:

"Mr. Deiterman, the reason we brought you in here is the State has indicated to the court, to myself that there is some possibility that you could potentially have some liability in this matter, that the State questions your actions in this matter potentially. The State requested that you be advised by myself prior to your tes-

timony today that you do have a right not to incriminate yourself. Now, I will tell you I don't know if the *Miranda* rights apply in this situation and I don't know if anything you might potentially say would tend to incriminate you, but I felt I would go ahead and advise you that you obviously have a right not to incriminate yourself. Do you understand? That's the so-called Fifth Amendment privilege against self-incrimination. So I'm advising you that you do have that right prior to your testimony today, tomorrow or whenever it is you testify, if you would desire to talk to a lawyer I would certainly give you that opportunity . . . I wanted to advise you that you do have the right to consult with a lawyer and not to say anything that would tend to incriminate yourself in any proceedings."

The defense does not dispute, nor does the record reflect, that any of the statements made by the State as to Harvey were false or misleading to the court.

Deiterman admits the record is silent as to any prejudice this advice by the trial court may have caused. In fact, Harvey did testify and never claimed his right to Fifth Amendment protection. However, Frank Deiterman argues that conduct of this nature should be reversible error even when there is no showing of actual prejudice. Frank Deiterman's argument fails, for there is no showing that the prosecutor's and trial court's actions were improper.

Deiterman and the State both cite to this court's decision in *State v. Finley*, 268 Kan. 557, 998 P.2d 95 (2000), in support of their respective positions. *Finley* is helpful but factually different.

In *Finley*, at the prosecutor's request, the trial court advised one of the defendant's key witnesses, Denise Sklar, of her right to remain silent, her right to counsel with the suggestion that she confer with an attorney, and that her statements could be used against her if new charges were filed. The defense witness had originally been charged in the matter, but those charges had been dropped prior to trial. After thoroughly advising her of her rights, the trial court asked the prosecutor to reemphasize that she would use any statements by the witness against her and that once the witness took the stand she would have no choice but to answer every question asked. The prosecutor also told the witness that she believed it would be unreasonable for any attorney to allow the witness to testify. When the judge stated, "It is now my understanding that [the prosecutor] stated she would not file this charge, only if Ms. Sklar testifies," the prosecutor responded affirmatively. 268 Kan.

at 565. Sklar asked to be appointed counsel and eventually invoked her Fifth Amendment right, refusing to testify on the defendant's behalf. The defendant then made a proffer of what her testimony would have been had she testified. Highly summarized, the testimony was exonerative of the defendant.

In analyzing the defendant's claim for error, we opined that where the prosecutor's conduct amounts to substantial interference with a defense witness' free and unhampered choice to testify, then the defendant's due process rights have been violated. Applying this rule to the case, we continued:

"We find the actions of the prosecutor troubling. *It was certainly appropriate for a prosecutor to bring to the attention of the court that prospective witnesses may unknowingly incriminate themselves and should be advised of their rights before testifying.* However, once the witness had been advised by the court, the prosecution had fulfilled its duty to the court and the witness. In this case, as demonstrated by the above record, the prosecutor was not satisfied with the court's full explanation to the witness of her rights. Instead, at each opportunity the prosecutor sought to supply additional reasons to the witness why she should not testify. Finally, the prosecutor agreed with the court's somewhat ambiguous statement indicating that the prosecution intended to file a charge of felony murder if the witness testified in the defendant's trial." 268 Kan. at 567.

The present situation is almost a complete opposite of the facts before our court in *Finley*. Here, the State appropriately presented a legitimate question to the court that Harvey may in fact incriminate himself by his testimony on the stand. The prosecutor moved the court to advise the witness but made no additional comments to the very clear but non-threatening advice given by the trial court. The record reflects that there were several facts that came out at the time of trial that could contribute to a possible case the State might have against Harvey. As we stated in *Finley*, "[i]t was certainly appropriate for a prosecutor to bring to the attention of the court that prospective witnesses may unknowingly incriminate themselves and should be advised of their rights before testifying." The State's actions were not threatening but instead fell directly within the category of prosecutorial action this court has deemed appropriate. The trial court did not err in its advice to Harvey Deiterman.

*Cumulative error*

Deiterman next argues that based on all the cumulative errors at trial, he was denied a fair trial. The only errors he cites to are those already discussed above. Having found no error in any of Deiterman's issues, his claim of cumulative error must likewise fail. See *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 (1992). We further note that the evidence against Deiterman was overwhelming. *State v. Valdez*, 266 Kan. 774, 802, 977 P.2d 242 (1999).

*Sufficiency of the evidence*

Deiterman next argues that there was insufficient evidence to support the jury's findings on each charge.

When reviewing the sufficiency of the evidence, the standard is whether after reviewing all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational jury could have found Deiterman guilty beyond a reasonable doubt. *State v. Rodriguez*, 269 Kan. 633, 634, 8 P.3d 712 (2000).

Deiterman's challenge of the capital murder and conspiracy to commit capital murder charges is a request that we revisit our holding in *State v. Bey*, 217 Kan. 251, 260, 535 P.2d 881 (1975), and now hold that uncorroborated accomplice testimony is insufficient to sustain a conviction. We decline to do so and point out that there was substantial additional evidence in this case of Deiterman's actions beyond the testimony of his accomplices.

Deiterman also challenges the sufficiency of the evidence as to the aggravated robbery charge. He contends the victim's wallet was taken to make the murder look like a robbery, according to Wilkerson, and not with the intention of actually robbing the victim, and that the evidence does not substantiate the crime of aggravated robbery.

Aggravated robbery is defined as robbery "committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery." K.S.A. 21-3427. Robbery is defined by K.S.A. 21-3426 as "the taking of property from the person or presence of another by force or by threat of bodily harm to any person."

Examining the evidence in a light most favorable to the prosecution, after Deiterman shot the victim, once from a distance, and then a second time in the head from close range, he reached into the victim's pocket and took out his wallet. He then entered the getaway car and left the scene. This evidence reflects that Deiterman knowingly took the victim's wallet, that he used force in order to obtain the wallet, and that he was armed with a deadly weapon during the commission of the crime. Sufficient evidence exists to support the conviction of aggravated robbery.

*Sentencing*

Deiterman contends the trial court erred in imposing the hard 40 sentence. He argues the court did not give appropriate weight to the mitigating factor of his lack of criminal history and erred by not considering the short length of his coconspirator's sentences.

As the State points out, the latter argument fails because the court did consider as a mitigating factor the length of sentences actually received by each of the co-conspirators.

When reviewing the trial court's imposition of the hard 40 sentence, we said in *State v. Spain*, 269 Kan. 54, 60, 4 P.3d 621 (2000), that "[t]he trial court's weighing of the aggravating and mitigating circumstances is within its sound discretion and will not be disturbed on appeal absent an abuse of discretion."

As an aggravating factor, the court found that K.S.A. 21-4636(c) existed, that is, the crime was committed by Deiterman for the purpose of receiving money or anything of monetary value. As mitigating factors, the court considered that Deiterman did not have any convictions of prior crimes, that Deiterman was only 20 years old at the time he committed the crime and, as mentioned above, the length of the sentences of the coconspirators.

The court gave little weight to the lack of criminal convictions, expressly noting that the evidence at trial showed that Deiterman was heavily involved in the use and sale of illegal drugs. The trial judge said, "I find that to be a mitigating factor but I, frankly, do not place much weight on that mitigating factor."

There is no case law support for Deiterman's argument that lack of criminal history in K.S.A. 21-4637(a) refers only to convictions

of record. The specific wording that the court may consider "[t]he defendant has no significant history of prior criminal activity" makes no mention of any such limitation. The trial court properly considered Deiterman's criminal activity.

The trial court did not abuse its discretion in entering the hard 40 sentence under the facts of this case.

The convictions and sentences are affirmed.